THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WARDELL MONTGOMERY, Defendant-Appellant.

Fourth District   No. 4—88—0259

Opinion filed December 1, 1988.—Rehearing denied December 20, 1988.

Daniel D. Yuhas and Gloria A. Carroll, both of State Appellate Defender's Office, of Springfield, for appellant.

Donald D. Bernardi, State's Attorney, of Pontiac (Kenneth R. Boyle, Robert J. Biderman, and Linda Susan McClain, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE LUND delivered the opinion of the court:

Following a jury trial, defendant Wardell Montgomery was convicted of two counts of aggravated battery in violation of section 12—4(b)(6) of the Criminal Code of 1961 (Ill. Rev. Stat. 1987, ch. 38, par. 12—4(b)(6)). The circuit court of Livingston County sentenced defendant on one count only to an extended term of seven years' imprisonment, which term was to be served consecutively to his current term of imprisonment. Defendant appeals his conviction and sentence. We affirm.

On appeal, defendant contends the following errors occurred: (1) the trial court erred in refusing to give the jury an instruction on self-defense when defendant produced evidence at trial that would support the instruction; (2) defendant was denied a fair trial because of com-

ments made by the prosecutor in opening and closing arguments; and (3) the trial court considered improper factors in aggravation as a basis for imposing an extended term of imprisonment upon defendant.

The instant case revolves around an incident which occurred on June 29, 1987, at the Pontiac Correctional Center. Defendant is an inmate serving a 25-year term for murder. On August 21, 1987, an indictment was filed charging defendant with two counts of aggravated battery against Gerald Hornstein, a correctional officer. Count I charged defendant with inflicting bodily harm upon the officer, who was acting within the scope of his official duties. Count II charged defendant with making physical contact of an insulting or provoking nature against the correctional officer. Defendant's motion for change of venue was granted, and the trial was moved to McLean County.

The State filed a pretrial motion for discovery on September 14, 1987. The motion requested defendant to state any defenses, affirmative or nonaffirmative, which he intended to assert at trial. The court ordered the parties to complete discovery by October 14, 1987. Defendant filed his discovery answer on Friday, January 29, 1988. The answer stated that defendant might call Anthony Dixon, another inmate, as a witness. The answer did not assert any defenses. The late answer precluded the State from obtaining certified copies of Dixon's conviction for impeachment purposes.

Defendant's trial began on Monday, February 1, 1988, and lasted two days. Gerald Hornstein, the complaining witness and a correctional officer at Pontiac Correctional Center, testified that on June 29, 1987, he was on duty as security guard at the front door of the Lincoln College Complex at the prison. The front door was kept locked. It was only opened to allow inmates in who had permission to be there, or to allow inmates out for their noon meal. Hornstein kept a log of which inmates were in the building at all times. He explained that a call-line pass is a slip of paper issued to residents to travel to a certain destination. The time of issuance is put on the pass, and the inmate has 15 minutes to get to his destination. Shortly after 11 a.m., defendant came to Hornstein's door with a call-line pass. Defendant handed the pass through the door's porthole. Defendant said he was there to take a makeup test, but his pass had been issued at 10 a.m. At the time, there were no instructors in the building, the only instructor having left for lunch. There had been only one class that day, an industrial maintenance class, and the inmates were beginning to finish their morning tasks in order to leave for the noon meal. Hornstein knew most of the 11 inmates in that class, and defendant was not in the class. Hornstein had no idea of a test being given that day. The day

before, the head of the college had told him that there would only be one class that day. No other residents were to be in the building except for certain individuals who were part of the maintenance staff. Hornstein refused to allow defendant into the college, telling him he could not possibly be there for a makeup test, as there was no instructor in the building. He told defendant to have the captain who issued the pass call him.

Defendant got angry at being refused permission to enter and began to kick and pound on the steel double door. According to Hornstein, defendant kept pounding on the door and telling Hornstein that the guard would have to open the door sometime, and defendant would get to him then. Hornstein called the tower guard and asked the officer there, Officer Albert Dodge, to have defendant removed from the door. Dodge got a megaphone and asked defendant to leave the area. Defendant cursed at the tower officer and refused to leave. After a minute or so, defendant disappeared from Hornstein's view. Hornstein then began the process of lining up the student inmates for them to go to lunch. He finished this process and waited for clearance from another tower for the inmates to leave for the dining area. The call came through about 11:20 a.m. Hornstein opened the door to run the 11 inmates out. About three men had left when defendant barged in the door, confronted Hornstein, and told him to touch defendant and see what would happen. Hornstein was scared and did not touch defendant. Hornstein was the only officer in the immediate area, was not armed, and had no radio. Defendant started coming at Hornstein, telling him to touch him. Hornstein tried to calm defendant down. Also, inmate Anthony Dixon pulled on defendant's arms and tried to calm defendant. Defendant pushed Dixon back and hit Hornstein in the face. Hornstein tried to get out of the building so the tower officer could see what was going on, but defendant blocked him and continued to hit him. Defendant hit Hornstein four times in the face and twice in the ribs. Hornstein stated he was knocked to the ground three times and had a tooth knocked out. At this point, Hornstein, who was bleeding, slid underneath defendant and out the door. He testified that he did not strike or punch defendant during the melee. Hornstein eventually required dental treatment to have the missing tooth replaced. In addition, he suffered bruised ribs. He was off from work for two weeks because of his injuries. Hornstein admitted on cross-examination that it would not have been proper for him to make physical contact with an inmate unless the inmate physically assaulted him. If defendant had walked in and simply refused to leave, Hornstein was to notify a supervisor.

Officer Dodge testified that he was in the tower nearest the college at the time of the incident. Dodge remembered the call from Hornstein about an inmate who would not leave and who was banging on the door to the college building. Dodge testified that he yelled at defendant to move away from the door, and defendant moved some 15 to 20 feet. Dodge thought he was leaving and did not pay any attention after that.

A captain at the prison, Jack Durham, testified that defendant had requested a call-line pass to go to the college for a makeup test. Durham called the college to verify that defendant was authorized to go there, but he received no answer. Although he should not have done so, he issued a pass to defendant because he knew defendant and trusted him. Durham put 10 a.m. on the pass. The college was approximately 150 to 200 yards from where Durham issued the pass. It should only have taken defendant a few minutes to get to the college. The State then rested its case.

Anthony Dixon testified for defendant. He stated that he had prior convictions for rape, deviate sexual assault, armed robbery, and aggravated battery. He had known defendant for four years. Defendant and Dixon lived in the same cell house, had class together, and used the same dining room. Dixon testified as an eyewitness to the incident in which Hornstein was injured. Dixon stated that Hornstein and defendant got into a heated argument through the locked door about the defendant's pass. They shouted at each other for 5 or 10 minutes. Defendant was kicking the door. The argument seemed to end when it was time to start the lunch line. Dixon did not hear the tower guard yell over the megaphone, although he stated he was by the door during the entire incident. When Hornstein opened the door, defendant rushed in and confronted Hornstein about the pass. According to Dixon, defendant stated to Hornstein: "I had a call pass, you didn't have to act the fool keeping me from coming in the complex." Dixon stated that Hornstein "immediately reacted," and grabbed defendant by the collar. Defendant then hit Hornstein, and they wrestled. Dixon tried to separate them, but another inmate grabbed him and told him to stay out of it. Defendant and Hornstein ended up outside, and Hornstein yelled for the tower guard to shoot defendant. Dixon saw the injury to Hornstein's mouth, but defendant appeared to be uninjured.

Defendant testified on his own behalf. He stated that he had a prior conviction for murder. He had been at the Pontiac Correctional Center for four or five years. He stated that he had missed a test because of his job as a segregation worker. Defendant said he saw his instructor on the day of the incident and asked him if he could go to

the college and take the test. Defendant was unsure what class it was, but he thought it was literature. Captain Durham gave defendant a call-line pass about 10:05 or 10:10 a.m., and defendant went straight to the college. It took four to five minutes to get there.

Defendant stated that when he got to the college, he knocked repeatedly on the door. Hornstein finally came to the door, and defendant gave him the pass. Hornstein handed it back and shouted something at defendant. Defendant took the pass and waited. Defendant knocked again after a minute or so. Hornstein yelled at the defendant, and defendant got angry. He started kicking the door and shouting at Hornstein. They argued for five to seven minutes. Defendant did not recall the tower guard telling him to leave, and he did not leave. Hornstein opened the door for the inmates to go to lunch. As the inmates were leaving the college, defendant interrupted the line and stepped up to the door, showing the pass again. Once defendant was inside, defendant stated that Hornstein pushed him into the second steel door that was closed. Hornstein pushed defendant again. A third time, Hornstein approached defendant and raised his foot as if to kick him. Defendant then hit Hornstein in the face. Hornstein ran out the door shouting to the tower. Defendant stated Hornstein never fell down. Defendant testified that it was not uncommon for the officers and inmates to yell at each other. Defendant stated he had gone in and out of the college many times when Hornstein was on duty. Also, gate officers routinely admit inmates if they are late, as long as the passes do not appear to be forged.

On cross-examination, defendant was asked his view of a guard's authority over him. Defendant stated that in situations where he is not given his way, the custom is to verbally abuse a guard until the guard gives in. Defendant stated that the guards essentially have little authority over him. If they ask him to do something he was going to do anyway, he would do it. However, if they asked him to do something he did not want to do, he would not do it. On redirect examination, defendant stated that the risk in disobeying a guard is to receive a "ticket." The judgments he made on whether to obey a guard's order were based on whether he was willing to receive a ticket for disobedience.

In rebuttal for the State, a correctional officer and a registered nurse testified that defendant had skinned knuckles after the incident, that defendant admitted to them that he had hit Hornstein, but that he did not say that Hornstein had pushed him. Also, Officer Dodge testified that he never heard anyone shout for him to shoot defendant.

During the instruction conference, defense counsel stated his de-

sire to submit an instruction on self-defense. The court replied that it would not accept such an instruction. No instruction on self-defense appears in the record. The jury returned a verdict of guilty on both counts of aggravated battery. Judgment of conviction was entered only on count I, the charge encompassing bodily harm to Hornstein. The circuit court sentenced defendant to an extended term of seven years' imprisonment based upon a finding of the presence of certain aggravating factors. Defendant filed a timely notice of appeal.

Initially, defendant argues the trial court erred in refusing to give the self-defense instruction. At the instruction conference, the court stated it would not accept the instruction because defendant had not produced any evidence that would justify it. The court also determined to refuse the instruction because the defense of self-defense, an affirmative defense, had not been disclosed to the State prior to trial in compliance with discovery. In fact, defendant furnished the name of his only witness on the Friday before the Monday trial started. Nothing was mentioned in defendant's answer to discovery about a theory of self-defense. The prosecutor noted on the morning of trial that he had no indication "what type of defense, affirmative or nonaffirmative defense, the defendant intends to assert today at trial."

Defendant argues that his testimony and that of Anthony Dixon, if believed, indicates defendant was acting in self-defense. Defendant testified that he had been kicking on the steel door and shouting at Hornstein when Hornstein would not open the door for him. When Hornstein did open the door to let the inmates leave for lunch, defendant interrupted the line, entered the door to the college, and confronted Hornstein about the pass. Hornstein then pushed defendant up against the metal door twice and, according to defendant, approached him as if to kick him. At that point, defendant punched Hornstein. Dixon testified that Hornstein's immediate reaction to defendant's presence was to grab defendant by the collar. At that point, according to Dixon, defendant punched Hornstein. Defendant concludes the evidence met the minimum required to support an instruction concerning self-defense, and that it was reversible error for the trial court to refuse the instruction. Moreover, defendant argues that refusing the jury instruction, as a sanction for failing to comply with discovery, was an improper sanction as a matter of law.

The State responds by arguing the sanction was proper under the circumstances. Further, the evidence adduced at trial, even if construed in favor of defendant, did not merit the giving of the self-defense instruction.

■ Under normal circumstances, a defendant is entitled to an in-

struction on a given theory of defense even when " 'very slight' " evidence is presented to support that theory. (*People v. Bratcher* (1976), 63 Ill. 2d 534, 540, 349 N.E.2d 31, 34, quoting *People v. Khamis* (1951), 411 Ill. 46, 53, 103 N.E.2d 133, 136.) As stated in *People v. Larry* (1986), 144 Ill. App. 3d 669, 676, 494 N.E.2d 1212, 1217:

> "There must, however, be enough evidence to require that the issue be submitted to the jury. Stated otherwise, unless the evidence before the trial court is so clear and convincing as to permit the court to find as a matter of law that there is no affirmative defense, the factual issue—that is, whether the defendant should be relieved of criminal liability by reason of his affirmative defense—must be determined by the jury with proper instruction as to the law applicable."

Where the evidence presented at trial is insufficient to meet this minimum standard, it is proper to deny the requested instruction. (*People v. Wallace* (1981), 100 Ill. App. 3d 424, 430, 426 N.E.2d 1017, 1023.) Section 3—6—4(b) of the Unified Code of Corrections (Ill. Rev. Stat. 1987, ch. 38, par. 1003—6—4(b)) provides that correctional officers are permitted to "use all suitable means to defend themselves, to enforce the observance of discipline, [and] to secure the persons of the offenders" against those who "disobe[y] or resis[t] any lawful command." Both parties agree that the instant case is analogous to that of a private person's use of force against a police officer:

> "In Illinois, an individual may not use force to resist an arrest which he or she knows is being made by a peace officer, even if he or she believes that the arrest is unlawful and it is in fact unlawful. (Ill. Rev. Stat. 1979, ch. 38, par. 7—7.) This rule is qualified, however, in that it does not apply to a situation in which an officer uses excessive force. The use of excessive force invokes the right of self-defense. (Ill. Rev. Stat. 1979, ch. 38, par. 7—1.)" *People v. Bailey* (1982), 108 Ill. App. 3d 392, 398, 439 N.E.2d 4, 9.

See also *People v. Athey* (1976), 43 Ill. App. 3d 261, 265, 356 N.E.2d 1332, 1335-36.

■ We conclude that, accepting defendant's testimony as true, defendant was not faced with a guard's use of excessive force. After entering into a shouting match with Hornstein and kicking the steel door in order to gain entry, defendant broke through the line of inmates leaving for lunch and confronted the officer regarding a pass that, by its own terms, had expired. He now requests an instruction on self-defense because he was pushed up against a wall by the unarmed officer. There is no testimony that defendant was put in fear during

this incident. The trial court was clearly not in error in refusing the instruction. Since the evidence given by defendant was insufficient to warrant the giving of the self-defense instruction, it follows that the court's alternative holding, that the instruction should not be given as a sanction for failing to comply with discovery, was not improper.

Defendant next argues the prosecutor made prejudicial remarks in both his opening statement and closing rebuttal argument. During the opening statement, the prosecutor described the evidence the State would present. In his discussion, he made it clear that defendant was an inmate at the Pontiac Correctional Center, and the victim of his alleged assault was a correctional officer who was on duty at the time of the incident. After the summary of the State's evidence, the prosecutor made the following remarks concerning the defendant's case:

"That is essentially what happened back on June 29th of last year. Now, whether you are going to hear that story from all sides, the People are unable to tell you. First of all, the defensen [*sic*] is not burdened with proving anything so, therefore, they do not have to put on a case in chief, if they don't want to. If they do and if certain individuals testify, I want you to keep in mind one thing. The judge, at the end of the case, will instruct you as to one of the factors you may use in determining whether or not that person is telling the truth and for that purpose you can see what kind of individuals they are, their demeanor on the witness stand, how they are acting, do they appear to be telling the truth or do they appear to be lying. You can also consider for purposes of whether or not you believe them *** their criminal record. You cannot consider that for whether a person is guilty of this offense but whether or not, as a witness, you believe that person, and I think when you hear all the evidence in this case, it will be absolutely clear to you this defendant is guilty of aggravated battery in two counts as charged."

Defendant argues the reference to criminal records as impeachment evidence was a blatant attack on defendant's right to remain silent. Defendant states it is only where a defendant takes the stand that he may be impeached by proof of prior convictions. Further, defendant argues the prosecutor attempted to prejudice the jury by informing them of defendant's criminal record prior to his appearance on the stand as a witness. However, no objection was made at trial, nor in defendant's post-trial motion.

Defendant also finds a portion of the prosecutor's closing argument objectionable. During the rebuttal portion of his closing argument, the prosecutor made the following remarks:

"You also heard testimony from the defendant about some of the things that Mr. Dixon had previously testified to. When you get back into the jury deliberation room, keep in mind one thing. The State's witnesses didn't have the opportunity to sit in the back of the courtroom and listen to what the people actually before them testify on the witness stand and incorporate that in their story so when they get up there, it jibes. The defendant has an opportunity to sit in the courtroom and hear the State witnesses testify and hear his own witnesses testify and then make it all come together the best he can to make his testimony as consistent as possible. So usually if a defendant testifies, he testifies last instead of testifying first before all his other witnesses go on, so his story can match. Keep that in mind."

Defendant argues this was an argument directed at his constitutional right to be present at his trial, and his right, with counsel's assistance, to determine when he should testify, if at all. Again, however, no objection was made at trial, nor in defendant's post-trial motion.

■ This kind of comment by the State's Attorney is subject to criticism, but we find defendant's arguments are waived by his failure to make objection at trial or in his post-trial motion. (*People v. Neal* (1985), 111 Ill. 2d 180, 196, 489 N.E.2d 845, 851, *cert. denied* (1986), 476 U.S. 1165, 90 L. Ed. 2d 733, 106 S. Ct. 2292.) Defendant argues the alleged errors were such as to constitute plain error and should be examined on appeal. We disagree. The plain-error exception to the waiver doctrine is restricted to situations where the evidence is closely balanced, or the error is so great that it denies defendant a fair trial. (*People v. Stewart* (1984), 104 Ill. 2d 463, 488, 473 N.E.2d 1227, 1238, *cert. denied* (1985), 471 U.S. 1120, 86 L. Ed. 2d 267, 105 S. Ct. 2368.) We find that neither situation applies in the instant case.

Defendant next argues he was sentenced to an extended term of imprisonment based on the trial court's consideration of improper factors in aggravation. At the sentencing hearing, the court found no factors to consider in mitigation. In aggravation, the court found that the injury inflicted was serious and that a sentence of imprisonment was necessary to deter others from committing the same offense. In addition, the court found defendant had a prior criminal record, which was the murder conviction for which he was serving time when the aggravated battery occurred. Based on defendant's murder conviction, he was eligible for an extended term of imprisonment. (See Ill. Rev. Stat. 1987, ch. 38, pars. 1005—8—2, 1005—5—3.2(b).) The court sentenced defendant to an extended term of seven years' imprisonment, to be served consecutively to his current sentence.

Defendant argues the fact that he was an inmate incarcerated for a previous conviction is a fact that is implicit in any aggravated battery involving a prison guard. Therefore, he argues his previous offense was used as an aggravating factor in determining his sentence. Defendant also argues his prior conviction was used to elevate the crime, as well as to enhance his sentence. Defendant reasons that he was an inmate because of his previous offense. His actions against Hornstein were elevated from simple battery to aggravated battery because he is an incarcerated person. We disagree with defendant's reasoning.

■■ Defendant's prior conviction for murder was properly considered as a factor in aggravation for the instant offense. The fact that defendant had a prior conviction for murder has nothing to do with the particular elements of aggravated battery against a correctional officer (see Ill. Rev. Stat. 1987, ch. 38, par. 12—4(b)(6)), except that it placed defendant in close proximity to correctional officers on a daily basis. Thus, he was placed within the sphere of persons to whom the statute gives a warning, *i.e.,* that correctional officers are to be given added protection because of the nature of their job. Defendant did not heed the warning and was properly charged with the offense of aggravated battery of a correctional officer. Further, for sentencing purposes, the fact that defendant had a previous record, and was, therefore, an inmate, is not implied in the offense. As the State points out, "a visitor, or a fellow correctional officer could [also] be guilty of this offense."

■■ Finally, defendant argues the trial court considered defendant's instant conviction for aggravated battery as an aggravating factor at his sentencing hearing. A review of the record indicates defendant is taking the court's comments out of context. The court was responding to defendant's stated desire to avoid more time incarcerated at Pontiac. The court was considering defendant's statements in allocution, and the fact that defendant appeared to be unusually articulate and intelligent. "On the negative side," the court stated it had to sentence defendant for the current offense. The record indicates the court did not consider improper factors in aggravation.

For the reasons stated above, the order of the circuit court of Livingston County is affirmed.

Affirmed.

KNECHT and SPITZ, JJ., concur.