# Illinois Official Reports

## Appellate Court

---

> ### *People v. Rutigliano*, 2020 IL App (1st) 171729

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. AARON RUTIGLIANO, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>No. 1-17-1729 |
| Filed<br>Rehearing denied | May 8, 2020<br>June 4, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 15-CR-3338; the Hon. Thaddeus L. Wilson, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Lawrence C. Marshall, of Stanford, California, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Annette Collins, and Janet C. Mahoney, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion.<br>Justice Connors concurred in the judgment and opinion.<br>Presiding Justice Mikva concurred in part and dissented in part, with opinion. |

**OPINION**

¶ 1         Following a 2017 jury trial, defendant Aaron Rutigliano was convicted of first degree murder and aggravated battery and sentenced to consecutive prison terms of 30 and 2 years. On appeal, defendant contends that (1) he should have been convicted of second degree murder rather than first degree murder, and (2) the trial court erroneously instructed the jury that voluntary intoxication is not a defense. For the reasons stated below, we affirm.

¶ 2                                I. JURISDICTION

¶ 3         On January 12, 2017, a jury found defendant guilty of first degree murder and aggravated battery. On May 23, 2017, the court sentenced defendant to a total of 32 years' imprisonment and denied reconsideration of its sentencing. Defendant filed his notice of appeal on June 21, 2017. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606 (eff. July 1, 2017) governing appeals from a final judgment of conviction in a criminal case.

¶ 4                                II. BACKGROUND

¶ 5         Defendant was charged with first degree murder for the stabbing death of Antonio Gamboa and with attempted first degree murder and aggravated battery for slashing and cutting Gianna Pena, all allegedly committed with a knife on or about February 1, 2015.

¶ 6         Defendant answered that he would rely on the insufficiency of the State's evidence and could assert affirmative defenses of intoxicated or drugged condition—citing section 6-3 of the Criminal Code of 2012 (720 ILCS 5/6-3 (West 2016))—and self-defense.

¶ 7                                A. Pretrial

¶ 8         The State filed motions *in limine*, including one seeking to bar defendant from arguing diminished capacity as part of a reasonable doubt argument; that is, arguing or presenting evidence that he "was incapable of acting in a knowing or intentional manner on February 1, 2015." The State asserted that "[d]iminished capacity is not a defense recognized in Illinois" and sought to bar argument that defendant's intoxication rendered him unable to form the intent to commit first degree murder or to appreciate the criminality of his conduct, unless he "properly raised the defense of intoxication." While the record indicates that this motion was granted in part and denied in part, the relevant transcript does not include argument or a ruling on the motion.

¶ 9         The parties offered proposed jury instructions before trial, including self-defense and second degree murder based on an unreasonable belief in self-defense. Defendant's proposed instructions included one titled "Involuntary Intoxication or Drugged Condition" stating "A person who is in an intoxicated or a drugged condition which has been involuntarily produced is not criminally responsible for his conduct if the condition deprives him of substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." Illinois Pattern Jury Instructions, Criminal, No. 24-25.03 (approved Dec. 8, 2011) (hereinafter IPI Criminal).

¶ 10    At the instructions conference, defense counsel repeatedly referred to "the defense of involuntary intoxication." When the court asked if the defense case was "I was involuntarily intoxicated, but if I wasn't, then it was self-defense; or I was voluntarily intoxicated and I was defending myself," defense counsel replied "Sounds good to me." The court decided that the defense-proposed instruction on involuntary intoxication would be given if involuntary intoxication was properly raised at trial, and that self-defense and second degree murder instructions would be given if self-defense was properly raised at trial.

¶ 11                                    B. Opening Statements

¶ 12    In the State's opening statement, it argued that defendant was at a Super Bowl watching party with his girlfriend Danielle Fernandez and various other people including Gamboa and Pena, where drinks and marijuana were served. When Fernandez asked defendant if he wanted to leave the party to attend another party elsewhere, he declined. A short time later, defendant put a steak knife in his back pocket, grabbed Fernandez's arm, and told her that they were leaving. Remarking that he could kill them all, defendant shoved Fernandez across the room, picked her up, and threw her to the floor again. He then "turns his attention on every person that intervenes," attacking Pena and then Gamboa with the steak knife, stabbing the latter repeatedly even when party guest Daisy Martinez threw a vase and a bowl at defendant. One of the party hosts, Darud Akbar, tried to subdue defendant, who fought him off. Akbar and host Mia McNair then stabbed defendant in further efforts to subdue him, as the police had been called but not yet arrived. Defendant was only placed under control by the police. The State argued that "defendant was in control" despite some of his remarks that evening being "crazy," and that he acted with the intent to kill.

¶ 13    In his opening statement, defense counsel admitted "there's not going to be any real issue with what occurred" at the party nor a challenge to the credibility of the State's witnesses, though each witness "is probably going to have a different perspective of what occurred." Instead, the jury's task would be to "resolve a why in all of this," as not all killing constitutes first degree murder as the jury would be instructed. Counsel argued that Akbar served marijuana and Martinez served "spiked" punch during the party, which was "cool" and "mellow" until well after the halftime show when Fernandez asked defendant if he wanted to leave for another party. He politely declined, as the weather was foul, and there was no argument between defendant and Fernandez. Instead, defendant suddenly grabbed her by the arm and remarked that someone was trying to kill him and they needed to leave. They "end[ed] up on the floor," and the others surrounded them. Defendant put the knife in his pocket and then began swinging it around, stabbing Gamboa fatally while "screaming all sorts of things *** about Jesus and sex." Defendant fought without weakening, despite having two knives stuck into him, and continued fighting in the ambulance to the hospital. Counsel characterized defendant's actions as "in a split second [he] went crazy" and denied that he had any motive, noting that he "was never armed until he got to the party."

¶ 14                                    C. State's Evidence

¶ 15    Martinez testified to being Gamboa's girlfriend, and Fernandez testified to having been defendant's girlfriend. Pena and Breanne Lash testified to being coworkers of McNair, Martinez, and Fernandez in early 2015. Dawn Moore testified to being Akbar's niece, and Shiquetta Ector testified to being a friend of McNair. On the night of February 1, 2015, McNair

and her boyfriend Akbar hosted a Super Bowl viewing party at Akbar's home. As there was a snowstorm that night, Gamboa and Martinez picked up Pena, Lash, Fernandez, and defendant on the way to the party. Ector was at the party before Gamboa and the others, while Moore arrived after they did. Moore knew only Akbar and McNair, and Ector did not know McNair's coworkers or their boyfriends. Food and alcohol were served—defendant ate and drank—and McNair passed around a single marijuana cigarette or "blunt" that was smoked by McNair, defendant, Fernandez, Akbar, and Martinez. McNair, Akbar, and Fernandez testified that Gamboa also smoked the blunt.

¶ 16    Fernandez testified that, at the party, she and defendant were between the living room and the kitchen island. She asked defendant at some point after the halftime show if he wanted to leave to attend another Super Bowl party, but he replied that he was happy being at the party with her. He had not behaved unusually up to that point. However, a short time later, he told her that he needed to leave the party. When she asked why, he repeated that he had to leave and wanted to go home, and he squeezed her arm "very hard, like harder than I was comfortable with." He told her "this is what I've been training for, and we could kill them all" and said "things like I didn't understand, like we have to put the weed in a box or someone's going to try and kill me." Defendant reached behind him to a knife on the kitchen counter and put in in his pocket. Realizing that she "had to do something," Fernandez made eye contact with Moore and stood up. Defendant grabbed her, dragged her away from the kitchen island, shoved her against a shelf, and then threw her to the floor. As she tried to get up, he grabbed her hair and pushed her head into the floor. She called for help, "[s]omeone got him off of me," and she ran to a bedroom. When she came back, "it was a blur" but defendant had Gamboa against the wall and was "making a very deliberate motion" of stabbing him. Though she did not see the knife, she knew defendant had one, and Gamboa was "slumped against the wall" as if injured. Martinez threw various objects at defendant's hand but could not stop him from attacking Gamboa. Fernandez fled to a bathroom where Lash was hiding and they called the police. She could hear "a lot of screaming" and glass breaking, and defendant calling her name, so she did not leave the bathroom until the police arrived.

¶ 17    On cross-examination, Fernandez testified that defendant did not act unusually, and there were no unusual occurrences, such as arguments, before the incident. He did have two discussions with Lash, but Fernandez considered them "normal." He seemed to be enjoying himself at the party. When he grabbed her arm and demanded to leave, Fernandez presumed he meant to go to the other party. However, he then said that she knew why, which puzzled her. As to what else he said, "[i]t wasn't crazy or babbling *** just things I didn't understand." He said "he thought somebody was out to kill him" while she saw no sign of that being so. She also did not know why he said "we can kill them all." When asked if he "freaked out," Fernandez replied that she did not "know if freaking out is the word I would use to describe when he start[ed] attacking me." She acknowledged describing him to the police as "freaking out."

¶ 18    Martinez testified that, at some point during the game when she was seated on the couch with Gamboa, McNair, and Akbar, she noticed defendant and Fernandez "bickering" in the kitchen. While the argument became "louder and more aggressive" as it went on, she could not hear what they were saying. As defendant stood by the seated Fernandez, he grabbed her arm and tried to "pull her or force her to go with him." Martinez and Gamboa approached defendant and Fernandez, and defendant then "threw [Fernandez] against the wall" and shoved Martinez.

- 4 -

She fell to the floor, and she noticed that her wrist was slightly cut. Defendant then "directed his attention to" Gamboa with a steak knife in his hand, pinning Gamboa against the wall with his left arm and stabbing him repeatedly with the knife in his right hand. Gamboa was not visibly armed, and his only aggressive act was telling defendant to stop. Martinez saw defendant stab Gamboa about 14 times in the chest and face though Gamboa was unable to fight back. Martinez threw a vase at defendant's head, striking him, but he did not stop attacking Gamboa. When Martinez threw another vase at defendant's head, he turned to face her, Akbar, and McNair. Gamboa fell to the floor. Martinez ran from the home to seek help, and a neighbor called 911. She returned to Akbar's home to see Akbar and McNair on top of defendant pinning him to the floor as Pena attended to Gamboa's wounds. Defendant was still fighting Akbar and McNair, and he was "talking crazy" though Martinez "really couldn't make it out" as she was also trying to help the unconscious Gamboa. Paramedics arrived to take Gamboa to the hospital, and the police also came.

¶ 19     On cross-examination, Martinez testified that the party was uneventful until the argument between defendant and Fernandez. Before then, they had been whispering to each other, and defendant had a knife in his back pocket at the time. As defendant became louder, Martinez heard him "trying to get [Fernandez] to leave" but not why. Martinez denied that, once she and others stood to keep defendant from harming Fernandez, they surrounded him. She did not recall telling the police afterwards that "we all got up from the couch and kind of surrounded [defendant] for a second" but admitted it was "[p]ossibly" so. Martinez recalled defendant screaming at her but not what he said. When they approached defendant, Fernandez fled to the bathroom. As defendant struggled with Akbar and McNair on the floor, he had two knives in his abdomen. He was yelling "he was going to kill us" as he struggled, and was still struggling when paramedics arrived.

¶ 20     Lash testified that the only unusual occurrences that night before the incident was a brief political argument with defendant on the way to the party and another brief argument with him about the effects of taking marijuana when Lash declined the blunt. Both times, Lash stopped arguing with defendant when he became "passionate." Lash sat with Pena on the love seat while Gamboa, Martinez, Akbar, and McNair sat on the couch and defendant and Fernandez sat on chairs during the game. At some point, Lash saw defendant shove Fernandez, grab her hair, and push her to the floor. Pena "went to pull [defendant] off of" Fernandez by grabbing his shoulders, but he "stood up and *** flung her off." With Fernandez still on the ground, defendant faced Martinez with a knife in his hand. Lash fled to the bathroom and hid there, but she could hear screaming and glass breaking. Lash peeked out to see Fernandez at the bathroom door and let her in. Lash and Fernandez called 911 and did not leave the bathroom until the police arrived.

¶ 21     Moore testified that she was sitting and eating, only glancing at the game, when she noticed defendant whisper in Fernandez's ear. Moore could not hear what he was saying, but Fernandez seemed startled and looked at Moore. Fernandez "tried to get up and run, but [defendant] had grabbed her" by her hair and choked her by wrapping his arm around her neck. Moore then saw a knife in his back pocket. Defendant and Fernandez struggled, and she fell to the ground before yelling "somebody, he's trying to kill me," and fleeing to the bathroom. Fearing what defendant may do next, Moore hid behind the couch. Martinez tried to calm defendant, who seemed to Moore to be "a little hysterical" and "angry, I guess." Far from calming down, defendant shoved Martinez. When Gamboa approached defendant and tried to

calm him, defendant grabbed Gamboa by the neck and pushed him to the wall. Defendant looked briefly at Martinez before stabbing Gamboa repeatedly with the knife in his right hand as he held Gamboa against the wall with his left hand. Defendant continued to stab Gamboa even after he fell to the floor and Martinez threw a vase at him. When defendant finally stood, Moore was still behind the couch while Akbar and Ector were on the couch. When McNair stood up from the couch to walk away, defendant "tried to go after her." "Everybody was screaming," and Moore grabbed Ector's cellphone to call 911. Akbar stood up from the couch and tackled defendant to the floor. As defendant tried to push off Akbar and stand, he said that he would "kill us all," "Can you get off me? Why are you all holding me down?" and "Let me up." Akbar asked Moore to bring him knives and commented on defendant's strength. Moore passed Akbar knives from his kitchen. As Moore was talking to the 911 operator, she told Pena to keep pressure on Gamboa's wounds. Moore let in the paramedics when they arrived. Before defendant attacked Fernandez, Moore did not "see anybody attack the defendant in any way," and did not see Gamboa armed.

¶ 22    On cross-examination, Moore testified that she did not see defendant grab Fernandez's arm between grabbing her hair and Fernandez falling to the floor. Defendant also fell to the floor when Fernandez fell. Moore denied hearing defendant call for his glasses or indeed any mention of glasses. As defendant and Fernandez were on the floor, only Martinez approached him while the others on the couch stayed there. Moore acknowledged telling the police that defendant "did not look like a normal person" but "looked like something was wrong." While Moore testified that defendant seemed angry, she did not "know what was going through his mind." However, when Moore was asked if defendant "could have been scared and frightened," she doubted it. He did not seem scared or frightened when he had his arm around Fernandez's neck or when he was stabbing Gamboa. In addition to saying he was "going to kill you all" and asking "Why are you holding me down," defendant "made some remarks about Jesus." She did not recall telling the police that defendant said "Let me up. Jesus. Sex. Help me up."

¶ 23    Pena testified that she was sitting on a love seat with Lash, eating and watching the halftime show, when she heard a commotion behind her where defendant and Fernandez were seated. Specifically, she heard Fernandez exclaim "Stop Aaron, what are you doing? Stop." The people in front of Pena—Martinez, Gamboa, McNair, and Akbar—stood. When Pena stood and turned around, defendant was holding Fernandez by her hair and then pushed her into the wall. Pena grabbed defendant by the shoulders and tried to pull him away. Instead, he "swung around at me and I heard Daisy yell 'He's got a knife,' and then I saw him come at me with the knife." Though Pena jumped back and fled to the corner of the room, defendant had struck her in the abdomen with the knife when he "swung backwards, swung around and wielded the knife at me." From the corner, Pena saw defendant holding Gamboa against the wall and stabbing him repeatedly in the chest. Pena fled to a bedroom briefly, then saw Akbar and McNair holding down defendant. Gamboa was motionless and bleeding on the floor, and Pena went to assist him. Moore brought Pena towels, which she held against Gamboa's chest. When the paramedics arrived, defendant was "yelling and screaming" and still being violent. The paramedics were told "that Aaron was dangerous and that we didn't want to let him up because we were afraid that he was going to attack someone again." On cross-examination, Pena testified that defendant was "engaging with other people" at the party before the incident. However, when asked if there was anything "unusual about him" before the incident, she felt

"he was being a little weird, but nothing that *** would make anyone predict that he would act that way." He wore glasses, but she did not see them fall to the floor.

¶ 24    Ector testified that there was a commotion at some point during the party. She specifically recalled defendant grabbing Fernandez's hair by the kitchen island and then a struggle between defendant and Gamboa with "a bunch of people just moving around." The fight ended up with defendant pinning Gamboa against the wall with his left arm and repeatedly swinging his right hand towards Gamboa's chest. Gamboa fell to the ground when "defendant walked away and started screaming and just yelling random stuff and looking for his next victim," and Ector saw that Gamboa was bleeding. As the other people were trying to avoid defendant, who Ector now noticed had a knife, he grabbed McNair, and Akbar went to McNair's defense. As Akbar wrestled defendant to the ground, defendant continued to struggle, and Akbar called for a knife. Ector passed Akbar a kitchen knife and left the room. On cross-examination, Ector acknowledged that defendant seemed "possessed" during the incident, "yelling and screaming and just saying who he was going to go after next." He was not acting that way before the incident.

¶ 25    Akbar testified that, during the game, he was seated on the couch with Gamboa and McNair, while Pena and another guest sat on the love seat and defendant sat by the kitchen table with Fernandez. Sometime after the halftime show, defendant "got up abruptly and was kind of being aggressive towards" Fernandez, leaning over her, grabbing her neck or hair, and whispering something in her ear that Akbar could not hear but could tell "was aggressive because of his mannerism." Martinez and other guests seemed shocked or bewildered while Fernandez seemed puzzled. Fernandez tried to run away from defendant but he grabbed at her. While everyone else was still in the living room, Gamboa went towards Martinez. Defendant shoved Gamboa with his left arm while his right hand was behind his back and then pulled one of Akbar's kitchen knives from behind him and stabbed Gamboa multiple times as he shoved Gamboa into a wall. He continued to stab Gamboa against the wall in the chest and face, "and each time that he stabbed him, he appeared to look around and then turn back and begin stabbing him again." Akbar was still in the living room, where everyone was screaming, as Martinez threw a vase and cups at defendant to end his stabbing attack on Gamboa. Defendant was struck but did not stop stabbing Gamboa, merely pausing to look at Martinez before resuming.

¶ 26    McNair tried to flee the room, and defendant reached for her. Akbar went to defendant, grabbed his hair, and punched him repeatedly in an attempt to subdue him. Defendant fought Akbar, "telling me he was going to kill me. He was going to kill everybody in the room. He was screaming all types of just bizarre things." As defendant and Akbar grappled, they fell to the floor with Akbar on top. Akbar pinned defendant to the floor with his body, his left hand on defendant's throat, and his right arm holding defendant's left arm. Defendant continued screaming, "saying all different kind of things. He is going to kill us. Sex is a drug." Because defendant was extremely strong, Akbar "didn't know how long I could keep him there" and asked McNair for help. McNair sat on defendant, who was still struggling and uttering threats. Akbar called for a knife and somehow got one, which he stuck into defendant's stomach. Defendant yelled even more but still resisted with great strength, so Akbar asked for more knives. He also said that someone should get a towel for Gamboa's bleeding wounds. McNair stuck another knife into defendant's chest or abdomen, but he continued struggling, "threatening everyone," and exclaiming "things like 'Jesus.' 'Sex is a drug' and just mostly

'I'm going to kill you.' " When paramedics and police arrived, Akbar told the paramedics to tend to Gamboa first. He was reluctant to get up from pinning defendant "because he was still strong. He was still moving erratically." He told the paramedics to tend to defendant but told the police that he would not get up until defendant was handcuffed.

¶ 27　　On cross-examination, Akbar testified when asked about a "weed box" that he kept a box of marijuana at the time of the party. The blunt that was smoked at the party came from that box, but Akbar could not recall if he had rolled it beforehand or during the party. However, Akbar testified before the grand jury that there were "approximately two blunts." While Akbar's attention was drawn by defendant being aggressive towards Fernandez, his aggressiveness in whispering in her ear was in his mannerisms, and he did not act violently until he grabbed her as she tried to run away. Nothing unusual had happened, and "everyone was just having a good time" up to that point. Defendant's exclamations during the incident were "some of the craziest things" Akbar had ever heard. After the incident, Akbar returned defendant's glasses, coat, and boots to the police.

¶ 28　　McNair testified that everyone was "having a good time" until the second half of the game. She was on the couch with Akbar, Gamboa, and Martinez, while defendant and Fernandez were seated by the kitchen table, when she looked over to see defendant whispering in Fernandez's ear, then grabbing her neck, and then grabbing her hair when she tried to flee. Pena stood up, but defendant pushed her down. Martinez approached defendant, who threw her into the kitchen. Martinez cried out that defendant had a knife. Gamboa approached and shoved defendant in the back, which was the first aggressive action towards defendant by anyone. Defendant turned around and stabbed Gamboa in the eye, then looked at Martinez before stabbing Gamboa several more times in the body and face as he held Gamboa against the wall. Martinez threw several glass objects at defendant, who did not stop stabbing Gamboa. Defendant then turned and approached the people on the couch including McNair. She tried to run away, but he grabbed her hair. Akbar struck defendant, and McNair fled the home to seek help from the neighbors. Martinez did the same and was successful. Hearing screams, McNair returned to Akbar's home to help. As Pena was tending to Gamboa's wounds, Akbar had defendant pinned down but asked for a knife because he could not hold the struggling defendant. McNair sat on defendant, who was still resisting. Akbar asked for a knife, and McNair got one from the kitchen, which Akbar stuck into defendant's stomach. Defendant yelled, "You can't kill me because I have diabetes. My blood is thick. You guys can't kill me," as well as threatening to kill "you guys." Akbar told McNair to stab defendant, who was kicking Akbar and McNair and trying to stand. McNair stabbed him in the stomach, but he was still struggling when police and paramedics arrived. McNair and Akbar were on top of defendant until police subdued him. He continued screaming, calling Fernandez's name, saying "sex is a drug" and that "we were trying to kill him." McNair realized that her hand was cut in the struggle.

¶ 29　　On cross-examination, McNair testified that defendant no longer had the knife after stabbing Gamboa when he approached the people on the couch, but she explained that he was significantly bigger than her. While defendant seemed angry during the incident, she did not know why as nothing unusual happened before he attacked Fernandez. As best as McNair knew, the only marijuana at the party was Akbar's and she passed around one blunt from Akbar's supply.

¶ 30    Police lieutenant Michael Casey testified that he went to Akbar's home in response to multiple 911 calls. He saw defendant struggling with firefighters and Akbar, though the firefighters were trying to treat defendant, and saw other firefighters treating Gamboa. When Casey was told that defendant had stabbed Gamboa, he tried to handcuff defendant, who resisted despite having two knives in his chest. Defendant was screaming and still fighting as the paramedics took him away to the hospital, but Casey could not recall what he said.

¶ 31    Paramedic Tarek Faizi testified that he and other firefighters went to Akbar's home in response to multiple 911 calls. There, he saw defendant on the floor with two knives in him. As he and another paramedic tried to get defendant onto a stretcher to take him to the hospital, defendant was kicking them repeatedly and trying to bite them. He did not stop when Faizi told him that he was being brought to a hospital. The paramedics eventually got defendant onto the stretcher and restrained him, and he became "relatively calm" but was screaming, including telling them to leave him alone. Defendant's eyes were normally reactive, and he eventually yelled in full sentences once in the ambulance, but he continued in a deliberate way to escape his restraints and to bite the paramedics as they treated him. He was disoriented, or more precisely "oriented times one" on a scale of zero to three, as he could say his name but not, for instance, where he was. Though it was not mentioned in Faizi's report, defendant threatened to kill the paramedics as they treated him.

¶ 32    The forensic evidence from the incident included bloody knives and photographs of the scene. A pair of eyeglasses was on the floor by the dining table. Two knives were collected at the hospital where defendant was treated. No fingerprints of defendant were found on the knives, but two had his blood and one had Gamboa's blood. No marijuana was recovered.

¶ 33    Medical examiner Dr. Jon Gates testified to Gamboa's autopsy. He had over 20 sharp-force injuries consistent with a serrated knife, both stabbing and slashing wounds, and died from these injuries. He had two wounds to his left eye, including one penetrating to the base of his skull, and many other wounds to his neck, chest, arms, legs, and back. He had defensive wounds to his hands.

¶ 34    After the State rested, a defense motion for a directed verdict was denied.


¶ 35                              D. Defense Evidence

¶ 36    Defendant testified that he had a master's degree in sports management and worked as a personal trainer since 2013. Fernandez was one of his clients before they became romantically involved. He worked on the morning of February 1, 2015, then was with Fernandez that afternoon. She invited him to the Super Bowl party, and he went home to prepare meals for the week. Fernandez picked him up with various other party guests, who were traveling together because there was a blizzard that night. When they arrived at the party, there was food and alcoholic drinks including punch. He took some food and drank some punch and one beer, and he sat with Fernandez by the kitchen island. Two blunts were also passed around the party, and he smoked about five times. Around halftime, he started feeling "very, very unusual" compared to the usual euphoria marijuana gave him. He had a worsening "feeling deep in my gut of incredible unease, and I started to feel a wave come over me, just tense, and my voice starts to cut off, like I have a lump in my *** throat and I start to feel panic." He was afraid "that I'm going to be attacked or be killed." When Fernandez asked him if he wanted to go to another Super Bowl party, he said "if we're going to go anywhere, we should just go home." She asked if they could stay at the party, and he was "fine" with that. When he tried to explain

to Fernandez that he feared being attacked or killed, she did not understand his whispered remarks "that I'm afraid and that I feel like someone is going to attack me and we need to leave and I might be killed." He was "holding her arm" as he leaned in to whisper to her. "At some point there is a knife on the counter. I take that and *** put it in my back pocket" because of his fear, though he did not fear any specific person. As he was sitting and still whispering to Fernandez, "I have my hands on her arm and I am kind of holding and she kind of pushes away and very quickly and we fall to the floor." As he fell, his eyeglasses fell off. He yelled "I can't see. I can't see. Where are my glasses?" as he searched for them. He needed glasses or contacts both to read and to drive, and his vision was very blurry without them. Nobody answered that they found his glasses.

¶ 37    As defendant was on the floor, "someone came up behind me and grabbed my back and they attacked me. I don't know what they were trying to do or what happened." Without his glasses, "I just saw everyone closing in." He turned around to fend off the person who attacked him, and "the knife is in my hand and then another person comes forward and attacks me again, and I kind of wave the knife in front of me to keep everyone at a distance because I can't see what's going on," but not intending to cut anyone.

> "Then another person comes in from the side and attacks me and grabs me and starts to wrestle and then it was kind of like a shuffle and scramble and we were just moving and wrestling, and *** I can't see what's going on. I'm trying to fend this person off, and I push all the way away from kind of the island area. And I have this—I push this person into the wall and I'm just trying to like fight them off because they are wrestling with me."

Defendant later learned that Gamboa was that person. He remembered "getting to the wall, and like seeing my arm come back and then kind of like go forward, and then stepping away and kind of seeing the person slump to the floor" before defendant dropped the knife.

¶ 38    Defendant was then "attacked from behind, and I end up wrestling with another person on the ground and we end up falling to the floor and we were just rolling around on the ground." He was "trying to escape and get out of" Akbar's home, but at "some point there's another person that gets involved and they stab me." Defendant continued fighting after being stabbed a second time. He fought anyone who tried to touch him, and he could not recall the police or paramedics arriving.

¶ 39    On cross-examination, defendant admitted that he regularly smoked marijuana in 2015 and chose to smoke a blunt at the party. Fernandez and other party guests smoked the same blunt as himself. The punch contained alcohol, and other guests also drank the punch. He did not feel strange when he smoked the blunt, but he began to feel strange during the second half of the game. He never complained to Akbar about the marijuana, nor did he tell Fernandez in explaining his fear that he believed he was drugged. He admitted grabbing Fernandez's arm and being emphatic about leaving but denied grabbing her arm "real hard" despite being strong from his physical training. Though he feared being attacked, he was facing Fernandez with his back to the other guests. Nobody was attacking him and nobody had a weapon but the knife in his own pocket. When Fernandez pulled away, he slid off the chair, they both fell to the floor, and his glasses fell off. She did not cry out for help. He did not recall grabbing Fernandez by the hair or shoving her away. He did not know how he ended up cutting the person who attacked him from behind as he searched for his glasses, as the knife was not in his hand. He did know that Fernandez was no longer nearby. After he fought off the person who attacked

him from behind, he "noticed" the knife in his own hand. While defendant maintained that he was not aiming as he swung the knife at Gamboa, he acknowledged that one of his blows entered Gamboa's eye and skull. Defendant denied that he "fought everybody who tried to stop [him] from doing what [he] wanted."

¶ 40    On redirect examination, defendant reiterated that he acted because he believed he was being attacked. While he felt "terror and panic" after smoking the blunt and had not felt that feeling before that night, he did not attribute it to the marijuana and did not know what caused it.

¶ 41    Hannah Applegate, Keith Skogstrom, and John Strand, three friends of defendant for four or five years, testified from observing him at work, socially, and as a roommate that he was peaceful and calm and a "really nice, easygoing person." None were at the party at issue. When asked if the fact that defendant fatally stabbed someone changed her opinion of defendant, Applegate replied that it was "inconsistent with everything else that I know about him from my personal interactions with him." Asked the same question, Skogstrom replied that his opinion did not change because "it doesn't follow suit with the person that I lived with, that worked for me, that I worked with. It's totally different than anything I could ever imagine." Strand replied "no" to the question, adding that he was still defendant's roommate for a few months after February 1, 2015.

¶ 42                                E. Jury Instruction Conference

¶ 43    The defense renewed its motion for a directed verdict, arguing that there was no evidence to support attempted first degree murder. The State argued that defendant's intent to kill Pena could be inferred from attacking her with a deadly weapon and the deadliness of his attack on Gamboa. The court denied the motion, finding that a jury could reasonably find attempted murder from the totality of the events and circumstances.

¶ 44    At the jury instruction conference, the court decided to give instructions on self-defense and second degree murder. Over a defense objection that the instruction would effectively bar second degree murder if the jury found defendant to have provoked the use of force even if he acted out of an unreasonable belief in self-defense, the court decided to instruct that a person who provokes the use of force against himself is justified only if the force used against him is so great that he reasonably believes he is in imminent danger of death or great bodily harm. See IPI Criminal No. 24-25.09. The State, noting that the defense had sought an involuntary intoxication instruction, argued that there was no evidence that defendant was involuntarily intoxicated. Defense counsel agreed, stating "I do not believe as a matter of law that that instruction is appropriate," and the court ruled that an involuntary intoxication instruction would not be given.

¶ 45    The State then sought a nonpattern instruction on voluntary intoxication, noting the evidence that defendant consumed marijuana and testified to feeling panic during the incident and arguing that intoxication was not a defense under the circumstances. The State wanted the jury instructed that there was evidence that defendant may have been intoxicated but the jury should not consider it in deciding whether he had the requisite mental state to commit the charged offenses. The defense objected that the instruction was not a pattern instruction and that the defense "haven't advanced an involuntary intoxication defense, we've actually withdrawn it." The court found that the defense did make such an argument, albeit "softly," and that the defense did not present sufficient evidence for such an instruction. Defense counsel

asked that the jury not be instructed on either voluntary or involuntary intoxication, arguing that the commentary in the pattern instructions recommends that no instruction be given regarding voluntary intoxication. The State argued that its desired instruction accurately stated the law as the evidence of intoxication "could be confusing to the jury on what they're allowed to consider under the law." The court stated that the commentary suggests that an instruction on voluntary intoxication can be given where it is not a defense, "which is such a case here" as voluntary intoxication would not be a defense to any of the charges. Defense counsel argued that, while the State bears the burden on the charges it brought, the defense has the burden of showing mitigation for second degree murder and the proposed instruction would prejudice the defense in making that showing. The State argued that the defense should not be able to argue an inference from defendant's intoxication that he had an unreasonable belief in self-defense. The court ruled that it would instruct the jury that a voluntary intoxicated or drugged condition is not a defense to any of the charges.

¶ 46                                    F. Closing Arguments

¶ 47        The State argued in closing that defendant "brutally murdered" Gamboa after arming himself with a knife, throwing his girlfriend against a wall, and turning his anger against the people who tried to defend her. He stabbed Pena when she tried to intervene and then went after Martinez, which prompted Gamboa to intervene. Defendant stabbed Gamboa repeatedly until his "lifeless body fell to the ground." Defendant then "turns around, looks at the other people, who's next?" Defendant was only stopped when Akbar and McNair intervened, and they "had to stab the defendant themselves" to stop him. The State argued that defendant was guilty of attempted murder because he took a substantial step towards killing Pena by arming himself with a knife and then stabbing her with it and showed his intent to kill her by stabbing her in the abdomen; she did not die because "she was able to get out of the way." Defendant was not acting in self-defense by attacking Pena because she had merely come to Fernandez's aid. The State argued that defendant was guilty of aggravated battery because he caused Pena bodily harm with a deadly weapon when he struck her with the knife and again he was not acting in self-defense against Pena.

¶ 48        The State argued that defendant was guilty of first degree murder because he performed the act that killed Gamboa when he repeatedly stabbed him, as shown by Gamboa's blood on the knife, and intended to kill him, as shown by repeatedly stabbing Gamboa in the face and chest and by remarking that he "could kill them all." Defendant intended to leave the party with Fernandez, tried to make her leave by force, armed himself with a knife against anyone who could try to stop him, and then used it or tried to use it against every person who tried to stop him. He was not acting in justified self-defense because Gamboa was unarmed and merely trying to help Fernandez and calm defendant when he stabbed Gamboa repeatedly. Defendant was the aggressor or first person to use force, against Fernandez, and thus could not use deadly force unless he reasonably believed it necessary to prevent his death or great bodily harm. However, nobody was blocking his exit when he started swinging the knife at people.

¶ 49        As to defendant acting out of an unreasonable belief in self-defense, the State argued that he armed himself with the knife before anyone acted aggressively. The State cast doubt on defendant's testimony that he suddenly realized "these people were out to kill him" once he lost his glasses, when defendant did not know most of the people at the party and various witnesses testified that the party was uneventful until defendant's actions. He did not act from

- 12 -

a belief in self-defense but out of "rage and anger" against Fernandez for not wanting to leave the party and against anyone who intervened to protect her.

¶ 50    Defense counsel argued that defendant was not "in a fit of rage" as the State argued, nor did the evidence support the proposition that he wanted to leave the party while Fernandez did not. "The case makes no sense and it never will make any sense." While the basic facts were not in dispute, the State's witnesses were biased and none "wants to help us," and the "catastrophic, frantic state everybody" was in after the incident affected witness perceptions. That said, "without question, *** something happened to" defendant. After eating, drinking, and smoking at the party, a "while later, something he doesn't attribute to the alcohol or the weed or anything, all of a sudden he is overpowered by this terror and fear." While the people at the party were not actually trying to harm him, "that is something going on between his ears;" that is, his skewed perception caused him to act out of a perceived need to defend himself. He was babbling and "talking crazy," remarking that someone was trying to kill him. His remarks that he could kill them all, or the like, were not evidence of his intent to kill but to defend himself. "He wasn't acting like a normal person." Both defendant and Fernandez testified that defendant grabbed her arm, she fell back, and defendant fell to the floor. His glasses then fell to the floor.

¶ 51    The defense argued that while Gamboa was stabbed multiple times, "[m]any of them are shallow, some of them are deep," and the fact that defendant stabbed Gamboa does not show his intent to kill Gamboa without justification. Defendant was a "good young man" who obtained his master's degree, and his friends testified to him being peaceful and "laid back." While the State argued "that this is a made-up story of terror and fear," counsel argued that the evidence showed that the party was "fine, uneventful" until defendant "smoke, drank, ate and an hour so whatever it was later suddenly he was in a moment of terror." Counsel urged the jury to "[g]o inside his head" and accept his perception even though "there was no reason to be filled with terror or fear." When he fell to the floor and his glasses fell off, "people begin to surround him. The attack he feared is on." He had armed himself with a knife "when he began to have this fear and long before the conversation with" Fernandez. Unable to see properly without his glasses, he swung the knife and warned the other guests to "get away from me, don't touch me." Pena was "scratched heavily" by the knife, showing that defendant was not trying to kill her but drive people away from him out of fear. "Then somebody gets on top of him." Gamboa "did everything right. He interceded to calm things down. He didn't know what was going on in [defendant's] mind." Defendant perceived Gamboa's actions as an attack, and he pushed Gamboa against the wall and stabbed him repeatedly. However, that was not "a fit of rage" but "a fit of terror."

¶ 52    Defense counsel argued that circumstantial evidence of defendant's remarks to Fernandez corroborated his irrationality and that he did not provoke the use of violence that night. The evidence that defendant had two knives stuck into him and continued fighting rather than fleeing the scene proved his "absolute terror and fear" that night.

> "By the way, he doesn't blame anybody. He isn't saying I know it's the weed, I know it's the alcohol, I know it was the food, I know it was—he doesn't know and we don't know and they don't know. If there's a motive in anything he did, if there were a motive it was a motive of self-preservation when he thought he was going to be attacked or killed. That would be the motive that makes sense."

- 13 -

Thus, defendant did not commit either first degree murder or attempted murder but was "horribly mistaken" because he "felt frightened, terrorized, had to defendant himself."

¶ 53    The State argued in rebuttal that defendant was not a victim of terror but a cause of terror on the night in question, and the only evidence that he acted out of fear for his safety came from his own testimony. While the defense argued that the State's witnesses were biased, they were merely "in the wrong place at the wrong time because they were in the same room with this defendant." The State noted that defense counsel said that there was not much dispute over the events of that night. Noting the testimony that defendant took up a knife before anyone had approached him, the State argued that "defendant's story just does not add up at all." The location where defendant's glasses were on the floor were not near where he had been seated, and the State argued that defendant did not fall from the fact that "every other witness you heard" testified otherwise. All the witnesses but defendant testified that defendant did not grab Fernandez's arm lightly but "real tight" and also grabbed her neck before throwing her against the wall.

¶ 54    The State argued that, if defendant believed everyone was going to attack him, it "makes no sense whatsoever" for him to remark that he could kill them all. Instead, those words showed that he was "a man who's looking to kill, *** a man with a plan" who executed that plan by arming himself with a knife. While defendant testified that he turned to talk to Fernandez while the knife was in his back pocket, that was not "how somebody who is actually in fear behaves" when he could walk out the door instead. While defendant testified that he called out for his glasses and that someone came from behind and grabbed him while he was on the floor, no other witness so testified. While defendant testified that stabbing Pena was a mistake, the State argued that its intentional nature was shown by defendant having to turn around to stab her. While there was some testimony that the other guests surrounded defendant, the weight of the testimony was that everyone else was by the couch. While defendant testified that he waved the knife to make space around him, he would have had space while he was stabbing Gamboa by merely backing away. Rather than a scuffle or struggle between defendant and Gamboa, the evidence showed that defendant immediately stabbed Gamboa in the eye. Defendant himself testified that the first time he tried to escape was when Akbar brought him to the floor, and the State argued that he had ample opportunity to leave or escape before that. The State noted that it does not have to show a defendant's motive to make its case. While the defense argued that defendant did not act out of rage, defendant's rage was shown by the extent of his injuries to Gamboa.

¶ 55    The State argued that there was nothing "crazy" in defendant remarking that he would kill people while he was actually trying to kill them and had succeeded regarding Gamboa nor in invoking a deity when he "just killed a man." Also, "it frankly doesn't matter what he says because [it is] the intent that's important *** the intent at the time he takes that knife and he stabs his victims." "[T]here is no other intent when you plunge a knife into another human being than to kill." The State noted the jury instruction that an initial aggressor "needs to have exhausted every other option" before using deadly force. However, defendant had options, including leaving the party and taking cover behind furniture. Defendant's character witnesses were all friends who testified that their high opinions of him were not changed by him fatally stabbing another person, but none of them were at the party. Defendant's intent to kill Gamboa was shown by his actions from taking up the knife to stabbing Gamboa repeatedly including in the eye and chest. While defendant testified that he used marijuana regularly and "start[ed]

to feel funny" after smoking the marijuana at the party, the jury would be instructed "that is not a defense to the offenses charged." "You cannot consider that as an excuse for his intentional actions that day" because he voluntarily smoked marijuana and "took that knife and turned it into a murder weapon" that night.

¶ 56                                G. Subsequent Proceedings

¶ 57    The jury was instructed on first degree murder, second degree murder based on an unreasonable belief in self-defense, attempted first degree murder, aggravated battery, and upon the affirmative defense of self-defense. The instructions referred to self-defense as a justification and to unreasonable belief in self-defense as a mitigating factor. The instructions included:

> "A person who initially provokes the use of force against himself is justified in the use of force only if the force used against him is so great that he reasonably believes he is in imminent danger of death or great bodily harm, and he has exhausted every reasonable means to escape the danger other than the use of force which is likely to cause death or great bodily harm to the other person." IPI Criminal No. 24-25.09.

The jury was instructed: "A voluntary intoxication or drug condition is not a defense to the charges in this case."

¶ 58    During deliberations, the jury asked the court whether it would be a mitigating factor if defendant was not sane when he committed murder. With the parties' agreement, the court instructed the jury that it had its instructions and should continue deliberating.

¶ 59    Following deliberations, the jury found defendant guilty of first degree murder and aggravated battery, finding him not guilty of attempted first degree murder.

¶ 60    The defense filed a posttrial motion that, in relevant part, challenged the sufficiency of the evidence and claimed that the jury instruction on voluntary intoxication was erroneous. The defense noted the evidence that defendant consumed alcohol and marijuana on the night in question but "never argued, or intended to argue, that Defendant's actions that evening were a result of Defendant's voluntary use of such substances. Moreover, during Defendant's testimony, Defendant denied believing that alcohol or marijuana played any role in the alleged offense."

¶ 61    At the posttrial hearing, defense counsel stood on the written motion. The State argued that the defense did not argue voluntary intoxication as a defense so that the instruction was harmless as well as an accurate statement of law. There was trial evidence that defendant voluntarily consumed alcohol and marijuana on the night in question, and he testified that "he began to get that feeling in his gut" after doing so. While he did not expressly claim that he had a mental breakdown due to that consumption, the defense had argued that the case made no sense and that defendant's actions resulted from misperceptions following that consumption. The instruction was necessary, the State argued, to keep the jury from reaching an erroneous legal conclusion.

¶ 62    The court denied the posttrial motion, finding the intoxication instruction appropriate. While the defense had not formally argued intoxication as a defense, it "was clearly trying to lay the ground work or alternative theory of something must have been wrong with the drugs or the punch *** that caused the defendant to wig out and stab this man to death." However,

- 15 -

"everybody drank out of the same punch and *** smoked from the same blunt," and the instruction was proper.

¶ 63    Following a sentencing hearing, the court sentenced defendant to consecutive prison terms of 30 years for first degree murder and 2 years for aggravated battery. Defendant's motion to reconsider the sentence was denied, and he timely filed his notice of appeal.

¶ 64                                III. ANALYSIS

¶ 65    On appeal, defendant contends that that (1) he should have been convicted of second degree murder rather than first degree murder and (2) the trial court erroneously instructed the jury that voluntary intoxication is not a defense. We shall address these issues in reverse order.

¶ 66                             A. Jury Instructions

¶ 67    Defendant contends that the trial court erred in instructing the jury that voluntary intoxication is not a defense, when evidence of voluntary intoxication may be used to show the defendant's state of mind when that is relevant. Specifically, he contends that whether he was involuntary intoxicated at the time of the offense is relevant to his state of mind for purposes of showing second degree murder. The State responds that the jury instruction at issue was proper and that voluntary intoxication cannot be used to show an unreasonable belief in self-defense.

¶ 68    Whether to give a particular jury instruction is within the sound discretion of the trial court, and the court does not abuse that discretion if the instructions taken as a whole fairly and fully apprised the jury of the relevant legal principles, but we review *de novo* whether a jury instruction correctly states the law. *People v. Slabon*, 2018 IL App (1st) 150149, ¶ 39.

¶ 69    Before 1988, section 6-3 of the Criminal Code of 1961 provided that an intoxicated or drugged person was

> "criminally responsible for conduct unless such condition either: (a) Negatives the existence of a mental state which is an element of the offense; or (b) Is involuntarily produced and deprives him of substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." Ill. Rev. Stat. 1985, ch. 38, ¶ 6-3.

Between 1988 and 2002, section 6-3 provided that an intoxicated or drugged person was

> "criminally responsible for conduct unless such condition either:
>
>     (a) Is so extreme as to suspend the power of reason and render him incapable of forming a specific intent which is an element of the offense; or
>
>     (b) is involuntarily produced and deprives him of substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." 720 ILCS 5/6-3 (West 2000).

Since 2002, section 6-3 has provided that an intoxicated or drugged person "is criminally responsible for conduct unless such condition is involuntarily produced and deprives him of substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." 720 ILCS 5/6-3 (West 2016).

¶ 70    The crux of defendant's contention is the effect of the amendments to section 6-3. He contends that, before 2002, voluntary intoxication was a statutory affirmative defense under certain circumstances and was held in case law to be relevant to state of mind, so that the 2002

amendment eliminating the statutory affirmative defense did not change the case law. The State contends that the purpose and effect of the 2002 amendment was to eliminate voluntary intoxication as an excuse for criminal behavior including showing an unreasonable belief in self-defense.

¶ 71     This court has previously considered a jury instruction on voluntary intoxication similar to the instruction now at issue. *Slabon*, 2018 IL App (1st) 150149, ¶ 39. The *Slabon* defendant contended that a jury instruction that " '[a] voluntarily intoxicated condition is not a defense to the charge of aggravated battery' " inaccurately stated the law because voluntary intoxication can negate a specific intent and because it misled the jury to believe that it could not consider his intoxication at all. *Id.* We held "that because section 6-3 does not mention voluntary intoxication, that condition cannot be a defense to criminal conduct," noting "the general principle under Illinois law that 'voluntary intoxication is not a defense to a criminal charge.' " *Id.* ¶ 33 (quoting *People v. Redmond*, 265 Ill. App. 3d 292, 302 (1994)). We found that the instruction was accurate because it "did not inform the jury it could not consider defendant's intoxication at all, only that voluntary intoxication cannot be a defense to the charge of aggravated battery." *Id.* ¶ 40. We also found that the State was entitled to an instruction to protect against adverse inferences from the trial evidence of the defendant's intoxication. *Id.* ¶ 41.

¶ 72     Here, the instruction being challenged by defendant is substantively identical to the one in *Slabon*: that voluntary intoxication is not a defense. As we stated in *Slabon*, voluntary intoxication is generally not a defense under Illinois law since 2002. As in *Slabon*, defendant contends that the instruction was likely misread by the jury as barring all consideration of intoxication evidence. We rejected that proposition in *Slabon* because that instruction—and the instruction at issue here—did not state that the jury could not consider intoxication evidence at all. We see no reason not to follow *Slabon* here. The court did not exclude trial evidence or argument regarding defendant's consumption of alcohol and marijuana nor did it instruct the jury to disregard evidence regarding intoxication. The jury *was* instructed that voluntary intoxication is not a defense, which we find to be a correct statement of law. This court was reciting as established law that "[a]s a general rule, voluntary intoxication is not a defense to a criminal charge" (*Redmond*, 265 Ill. App. 3d at 302) well before the 2002 amendment to section 6-3 in which our legislature chose to eliminate all reference to voluntary intoxication from the statutory affirmative defenses.

¶ 73     Last but certainly not least, the jury was not instructed that voluntary intoxication is not a mitigating factor. Second degree murder is not a defense or justification, nor is it a lesser included offense of first degree murder, but instead is first degree murder with an additional mitigating factor. 720 ILCS 5/9-2(a) (West 2016); *People v. Staake*, 2017 IL 121755, ¶ 40. "The State must prove the elements of first degree murder beyond a reasonable doubt before the jury can even consider whether a mitigating factor for second degree murder has been shown, such as *** whether his true belief in self-defense was unreasonable [citation]." *Staake*, 2017 IL 121755, ¶ 40. The jury here was properly instructed to that effect. We see nothing in the jury instructions that would have precluded the jury from finding defendant guilty of second degree murder. In particular, we see nothing in the jury instructions that would have barred the jury from finding defendant's unreasonable belief in self-defense from his testimony corroborated by the evidence regarding alcohol and marijuana consumption if its weighing of the evidence led it to that conclusion, but it did not. (We shall address this point more fully

- 17 -

below.) We conclude that the trial court did not abuse its discretion in giving the voluntary intoxication instruction.

¶ 74                                    B. Second Degree Murder

¶ 75     Defendant also contends that he should have been found guilty of second degree murder based on an unreasonable belief in self-defense.

¶ 76     A person commits second degree murder by committing first degree murder with "the following mitigating factor[ ] *** (2) at the time of the killing he or she believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his or her belief is unreasonable." 720 ILCS 5/9-2(a) (West 2016). While the State must prove the elements of first degree murder beyond a reasonable doubt, once evidence of a mitigating factor has been presented, "the burden of proof is on the defendant to prove [a] mitigating factor by a preponderance of the evidence before the defendant can be found guilty of second degree murder." 720 ILCS 5/9-2(c) (West 2016).

¶ 77     Section 7-1 of the Criminal Code of 2012 provides for the justification or affirmative defense of self-defense, specifically that:

> "A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." 720 ILCS 5/7-1(a) (West 2016).

See also 720 ILCS 5/7-14 (West 2016) (justifications in article 7 of the Criminal Code of 2012, including self-defense, are affirmative defenses).

¶ 78     However, justification is unavailable if a defendant

> "initially provokes the use of force against himself, unless:

> *** [s]uch force is so great that he reasonably believes that he is in imminent danger of death or great bodily harm, and that he has exhausted every reasonable means to escape such danger other than the use of force which is likely to cause death or great bodily harm to the assailant." 720 ILCS 5/7-4(c)(1) (West 2016).

The initial aggressor instruction, IPI Criminal No. 24-25.09, is properly given if the State presents evidence showing the defendant to be the aggressor or there is a question of whether the defendant was the aggressor. *People v. Salcedo*, 2011 IL App (1st) 083148, ¶ 37, *abrogated on other grounds by People v. Bailey*, 2014 IL 115459, ¶ 18. When an initial aggressor instruction is given alongside justifiable use of force instructions, the court is not assuming that the defendant was the initial aggressor but allowing the jury to resolve the evidence pursuant to either hypothesis. *Salcedo*, 2011 IL App (1st) 083148, ¶ 37.

¶ 79     Thus, the elements of self-defense against great bodily harm are that (1) unlawful force was threatened against a person, (2) who was not the aggressor, (3) the danger of great bodily harm was imminent, (4) the use of force was necessary, (5) the threatened person subjectively believed a danger existed requiring use of the force applied, and (6) that belief was objectively reasonable. *People v. Wilkinson*, 2018 IL App (3d) 160173, ¶ 35.

- 18 -

¶ 80    When the sufficiency of trial evidence is at issue, we must determine whether, taking the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *People v. Eubanks*, 2019 IL 123525, ¶ 95. Where a defendant contends that the evidence was sufficient to find him guilty of second degree murder, the issue on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the mitigating factors were not present." *People v. Blackwell*, 171 Ill. 2d 338, 358 (1996). It is the responsibility of the trier of fact to weigh, resolve conflicts in, and draw reasonable inferences from the testimony and other evidence. *People v. Harris*, 2018 IL 121932, ¶ 26. Thus, we do not retry a defendant. *Eubanks*, 2019 IL 123525, ¶ 95. The trier of fact is not required to disregard inferences that flow normally from the evidence, nor to seek all possible explanations consistent with innocence and elevate them to reasonable doubt. *Id.* In other words, the State need not disprove or rule out all possible factual scenarios. *People v. Newton*, 2018 IL 122958, ¶ 27. The trier of fact need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances if the evidence as a whole satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt. *In re Jonathon C.B.*, 2011 IL 107750, ¶ 60. A conviction will be reversed only if the evidence is so unreasonable, improbable, or unsatisfactory that a reasonable doubt of the defendant's guilt remains. *Harris*, 2018 IL 121932, ¶ 26.

¶ 81    Here, taking the evidence in the light most favorable to the State as we must, we find that a reasonable jury could find defendant guilty of first degree murder rather than second degree murder. The evidence supporting defendant's theory of the case that he committed the offenses at issue out of fear of being attacked, other than his own testimony to that effect, are the remarks and outbursts he made during the incident, his consumption of marijuana and alcohol at the party, and his eyeglasses on the floor of Akbar's home after the incident.

¶ 82    First and foremost, the jury was not obliged to find defendant a credible witness. While there were minor discrepancies in their accounts, the State's eyewitnesses—including Fernandez herself, defendant's girlfriend at the time of the incident—testified consistently to defendant grabbing Fernandez's arm forcefully, pulling her hair, and shoving her into the wall at the beginning of the incident. By contrast, defendant expressly denied gripping her arm "real hard" and testified to not remembering the remaining acts. We note that, while many witnesses were acquaintances of Fernandez and came to her defense on the night in question, Moore and Ector did not know defendant or Fernandez before that night and had no particular reason to favor Fernandez or disfavor defendant in their testimony. Also, defendant testified to swinging his arm at Gamboa with a knife in his hand once before Gamboa fell to the floor and defendant dropped the knife. However, the State's eyewitnesses and the scientific evidence were consistent that defendant stabbed and slashed Gamboa multiple times, impeaching defendant's self-serving account.

¶ 83    Only defendant testified to falling to the floor and losing his glasses before he interacted with anyone but Fernandez. It was a key element of defendant's trial testimony that his inability to see at that moment compounded or reinforced his fear of being attacked. However, a reasonable trier of fact need not find defendant's account corroborated from the evidence that his glasses were on the floor after the incident. It is undisputed that defendant was in various struggles that night, including on the floor with Akbar and McNair, and that could also explain the disposition of his glasses.

¶ 84    As to defendant's consumption of marijuana and alcohol, various people at the party testified to consuming both. While there was some evidence of more than one blunt, a reasonable jury could conclude from the evidence as a whole that a single blunt was passed around and smoked by various people at the party including defendant. Nobody but defendant testified to having a paranoid or fearful reaction, and defendant himself testified that he did not know the cause of his fear and did not attribute it to the marijuana that night.

¶ 85    Lastly, while there was evidence that defendant made bizarre or incomprehensible remarks, there was also evidence that he repeatedly threatened to kill everyone at the party and then the paramedics. Martinez and Akbar described defendant's interaction with Fernandez before he attacked her as aggressive. Moore testified that defendant seemed angry and did not seem scared or frightened. While Ector testified that he seemed "possessed," she also testified that he was "saying who he was going to go after next." In sum, while there was some evidence from which to infer that defendant acted out of fear, it was also a reasonable inference that he acted out of anger and with the intent to kill without justification. The jury reached verdicts consistent with the latter, and upon the evidence seen in the light most favorable to the State and with due deference to the jury as finder of fact, we shall not disturb those verdicts but affirm the resulting judgment of the trial court.

¶ 86                                    IV. CONCLUSION
¶ 87    Accordingly, the judgment of the circuit court is affirmed.

¶ 88    Affirmed.

¶ 89    PRESIDING JUSTICE MIKVA, concurring in part and dissenting in part:
¶ 90    I concur fully with the majority that the court's giving of the jury instruction was not an abuse of discretion. The law remains that voluntary intoxication is not a defense, and the majority is quite correct that nothing in this instruction precluded the jury from considering the fact that defendant was intoxicated in reference to whether he had the belief he claimed to have that he was in mortal danger.

¶ 91    However, in my view there would be no reason to reach this issue because I also believe that this is one of those very rare cases where the evidence failed to support the jury's verdict of first degree murder, even under the very deferential standard with which we must review that verdict on appeal.

¶ 92    While, as the majority points out, there was some disagreement among the State's witnesses as to what each of them subjectively believed the defendant was feeling at the moment he suddenly became violent, there was absolutely no dispute among any of the witnesses as to what the defendant did or that his conduct changed radically and suddenly just before he attacked people at the party.

¶ 93    The conduct that two witnesses who remembered the defendant's statements testified to was that, from the beginning through the end of this horrific incident, the defendant was saying that people were trying to kill him. It began with him frantically warning his girlfriend that they had to leave because "somebody was going to try to kill [him]," and at the end, when the defendant had finally been somewhat subdued and had knives sticking out of him, he was still saying that people were "trying to kill him." This was uncontradicted contemporaneous

testimony as to what the defendant believed at the time he acted. This testimony demonstrated—without evidence to the contrary—that he was acting based on a genuine, albeit completely unreasonable, belief that the force he was using was "necessary to prevent imminent death or great bodily harm to himself or another." 720 ILCS 5/7-1(a) (West 2016). This is what is required to reduce first degree murder to second degree murder. While there was also testimony that he said that he been training for this his whole life and that he acted in a manner that several of the witnesses described as aggressive, none of this contradicts in any way his contemporaneous statements as to why he was behaving as he was and indeed may even be further proof of his delusional state.

¶ 94      This undisputed evidence of a sudden onset of irrational fear does not exist in a vacuum. There were also trial witnesses who testified—again without contradiction—as to the defendant's reputation for being peaceful and there was a complete absence of any possible motive other than sudden irrational fear. There was also evidence that the jury was struggling when they asked, in the middle of deliberations, if they could consider insanity as a mitigating factor. While, as discussed above, the instructions did not *preclude* the jury from considering whether intoxication influenced the defendant's belief, there is still a concern, based on their question, that the voluntary intoxication jury instruction might have indeed confused the jury into thinking that it could not take into account the impact that the spiked punch, beer, and marijuana had on defendant's belief as to what was happening.

¶ 95      None of this context evidence alone is determinative. The State is under no obligation to prove motive, and as mentioned above, the jury instruction does accurately state the law. Nevertheless, where the defendant's behavior changed suddenly and inexplicably, and witnesses state the defendant expressly said that he thought someone was going to kill him, the conclusion seems inescapable that defendant acted in unreasonable self-defense. "[I]f only one conclusion may reasonably be drawn from the record, a reviewing court must draw it even if it favors the defendant." *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004).

¶ 96      A reversal for lack of evidence is rare, and a decision by this court that a first degree murder conviction must be reduced to second degree murder because of mitigating factors is even more unusual. However, where, as here, even after viewing the evidence in the light most favorable to the prosecution, it is clear that no "rational trier of fact could have found the mitigating factors were not present" (*People v. Blackwell*, 171 Ill. 2d 338, 357-58 (1996)), a reduction by this court in this defendant's conviction to second degree murder is required. For this reason, I respectfully dissent.