THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
EDDIE V. LARRY, Defendant-Appellant.

Second District   No. 2—85—0234

Opinion filed June 24, 1986.

G. Joseph Weller and Steven E. Wiltgen, both of State Appellate Defender's Office, of Elgin, for appellant.

James E. Ryan, State's Attorney of Wheaton (Kenneth R. Boyle, of State's Attorneys Appellate Service Commission, of Springfield, William Browers, of State's Attorneys Appellate Service Commission, of Elgin, and Andrea Becker, of Broadview, of counsel), for the People.

JUSTICE UNVERZAGT delivered the opinion of the court:

The defendant, Eddie V. Larry, was indicted on May 29, 1984, in the circuit court of Du Page County on six counts: count I, attempted murder (Ill. Rev. Stat. 1983, ch. 38, pars. 8—4(a), 9—1(a)(1)); count II, armed violence based on attempted rape (Ill. Rev. Stat. 1983, ch. 38, pars. 33A—2, 11—1(a)); count III, armed violence based on aggravated battery causing great bodily harm (Ill. Rev. Stat. 1983, ch. 38, pars. 33A—2, 12—4(a)); count IV, attempted rape (Ill. Rev. Stat. 1983, ch. 38, pars. 8—4(a), 11—1(a)); count V, aggravated battery causing great bodily harm (Ill. Rev. Stat. 1983, ch. 38, par. 12—4(a)); and count VI, aggravated battery using a deadly weapon (Ill. Rev. Stat. 1983, ch. 38, par. 12—4(b)(1)). Following a jury trial, the defendant was acquitted on the attempted-murder charge, but was found guilty of all the remaining charges. Judgments were entered on the verdicts. He was sentenced to concurrent terms of 10 years' imprisonment on each of the two armed-violence convictions.

Defendant contends (1) that it was error for the court to refuse to instruct the jury on the defense of involuntary intoxication, and (2) that the court erred in entering judgments of guilty on the verdicts of attempted rape and aggravated battery (counts IV and V) where they were the predicate offenses for the armed-violence charges (counts II and III), and in entering judgment on the guilty verdict of aggravated battery using a deadly weapon (count VI) since that charge was based on the single physical act of stabbing the victim with a knife as was charged in count V.

Nancy Garrett testified that on May 8, 1984, she was employed at Dunkin' Donuts in Oak Brook Terrace. About 3:15 a.m., a man subsequently identified as the defendant entered the store. He purchased

two donuts and left. Garrett returned to work in a storage area of the shop. She heard a bell ring, indicating that someone had entered the store. She walked toward the customer area and saw the defendant standing by the door between the customer area and the kitchen. The defendant had a knife in his hand. He told Garrett to "get in back." In the storage area, she fell to the floor. The defendant knelt beside her, reached up her dress and pulled down her underpants to her ankles. He pulled down his pants and tried to have intercourse with her. The defendant then stood up "real fast," picked up his knife and went to the sink in the kitchen and looked around. Garrett pulled up her pants and ran toward a door, but the defendant came from behind her and grabbed her by the neck. He stabbed her in the stomach and right chest area. He then gripped her neck with both hands. Garrett came to lie on the floor again. The defendant straddled her, pushing down on something in her neck with both hands. She repulsed the defendant by kicking him in the genitals. For a moment, the defendant stood by a freezer and looked around. He grabbed a shovel and returned to Garrett, striking her three times on her head. He pulled her up to her feet by her apron, grabbed a plastic garbage bag with both hands, brought it over her head and around her neck and pulled it tight. Garrett then blacked out. The next thing she remembered was Officer Gomez calling her name.

Frank Gomez, an Oak Brook Terrace police officer, testified that he was on routine patrol in his car on May 8, 1984. About 3:30 a.m., he pulled into the parking lot of the Dunkin' Donuts. A man later identified as the defendant approached Gomez' car from the rear. The defendant was wearing a purple jogging outfit. The defendant told Gomez that his car was out of gas and asked for a gas can. Gomez told the defendant to go to a Citgo station down the street. Gomez observed the defendant walk to a dark green car parked in the Dunkin' Donuts parking lot, open the trunk, and take out a gas can. The defendant then walked toward the Citgo station. Gomez entered the Dunkin' Donuts store, and called out Garrett's name. Shortly thereafter, he saw Garrett approaching from the east doorway; she was bleeding from wounds in her neck and stomach. She said that a man tried to rape her. She described him to Gomez as a black male in a purple jogging suit, with a dark-colored car. Gomez drew his weapon, searched the rear area of the store, and radioed for an ambulance and other police units. He left the store and saw the defendant in the parking lot. The defendant was carrying a gas can toward his car. Gomez placed the defendant under arrest. Other police officers and paramedics arrived. After a conversation with a paramedic,

Gomez asked the defendant where the weapon was. The defendant, now handcuffed, lead Gomez to a grassy area in front of a Ground Round restaurant next door. The defendant stopped, nodded, and in the grass nearby a knife was found. Gomez identified people's exhibit No. 6 as a photograph of the knife. The defendant was given *Miranda* warnings and he indicated he understood. Gomez drove the defendant to the police station. At the station, the defendant asked whether he was in trouble. He was advised again of his *Miranda* rights and placed in a cell. He asked to talk with Gomez about the incident and inquired whether this would go on his record. Gomez refused to talk to the defendant and suggested he wait for the arrival of a detective.

Oak Brook Terrace police officer John Kolberg testified that the blade of the knife found in the grass near the Dunkin' Donuts was 4 inches long. At 6:45 a.m. on the morning of May 8, the defendant made a statement to him. The defendant related that prior to the incident, he saw a man named Lazar in Broadview. He picked up Lazar, and they drove around, smoking marijuana. The defendant dropped Lazar off and proceeded to the Dunkin' Donuts. He purchased some donuts from Nancy Garrett, went to his car, retrieved a knife, and returned to the store. He told Garrett to take her clothes off. She backed away from him, and he pushed her to the floor. He removed her underpants and tried to have intercourse with her. Garrett got away from him briefly, and he struck her with a shovel, choked her with plastic garbage-can liners, and stabbed her. He left the restaurant and dropped his knife in front of the Ground Round restaurant. He then related the circumstances of his capture. After relating this version of the incident, Kolberg asked the defendant why he had attacked the victim. The defendant replied that he was not sure, that everything seemed to go "very fast." He felt that the marijuana he had been smoking may have contained a chemical or something which made him behave the way he did. Kolberg asked the defendant if he intended to rape the victim when he approached her, and the defendant replied that he did intend to do that, but was unable to because of the struggle. The defendant prepared and signed a written statement. The statement, people's exhibit No. 36, followed closely the substance of the defendant's oral statement, except that the defendant's written statement indicated that before he left Dunkin' Donuts, he saw Garrett crying and he began to cry, too.

Oak Brook Terrace police officer John Carpino testified that he was with Officer Kolberg and the defendant when the defendant made the written statement. The defendant took about 50 minutes to

write the statement during which he was writing continuously. Carpino said the statement had about one correction in each line.

The defendant testified that he graduated from a special-education program in high school. Prior to May 8, 1984, he was employed at Sears, and Hines Hospital. On May 7, 1984, he came home from work, ate dinner, went to his friend James Head's house for about an hour, and then went to his girlfriend's house. He had sexual relations with his girlfriend, drove her to a store and dropped her off back at her house. He then drove around for a while and stopped to visit with some friends until about 2 or 2:30 in the morning. He went to a convenience food store and bought an orange soda. Sometime between 2:30 and 3 a.m., he saw Lazar Walker, who lived around the corner from him. He asked Lazar if he wanted a ride, and Lazar got into defendant's car. They headed west on Roosevelt Road. While in the car, Lazar began to roll a marijuana cigarette. Lazar took a brown envelope out of his shirt pocket, and he put white powder from the envelope on top of the marijuana. The defendant testified Lazar had given him marijuana on two different occasions toward the end of April when they were at some friends' houses. On both occasions, after he smoked the marijuana, he got dizzy, drowsy and hungry. After Lazar put the powder on the marijuana, he finished rolling up the cigarette paper and handed it to the defendant, who lit it with his car cigarette lighter. Defendant testified he never asked Lazar what the powder was, nor did he receive any information at that time as to what the powder was. In response to why he did not ask Lazar what the powder was, the defendant replied: "I just didn't bother asking him. Really don't know." The next thing defendant remembered happened was that he ran a red light at 25th Avenue, and he remembered pulling up at the Dunkin' Donuts. He went in and bought two chocolate donuts from the girl behind the counter. He handed her a dollar bill. He left the store, got in his car, and began to feel dizzy. His head "seemed like it was getting bigger and [his] body seemed like it was getting smaller, smaller." He remembered reentering the Dunkin' Donuts and telling Garrett to "go in the back." He then either pushed her or she slipped onto the floor; he got on top of her and they wrestled. He then pulled down his jogging pants and pulled down her underpants. He testified he did not know what he wanted to do when he pulled down his pants and her underpants. He got up and pulled up his jogging pants and started getting dizzy. It was the same kind of dizziness that he had out in his car, and in the past when he had smoked marijuana or been on one of the rides at Great America that spins around. He recalled striking her with a shovel and her slipping

down the wall onto the floor. He wrapped a plastic bag around her neck and pulled on it. He saw tears coming to her eyes. He let the bag go, and then tears came to his eyes, too. He remembered he then started "poking her with something." He did not remember stabbing her when she tried to get out the door, choking her, pulling her up by the apron, or her losing consciousness.

On cross-examination, the defendant additionally testified that he smoked three "reefers" of marijuana at James Head's house before he went out driving around in the suburbs, eventually ending up at his girlfriend's house sometime between 8 and 9 p.m. He testified he had known Lazar Walker for about three years, but that "[w]e don't hardly communicate that much."

A private investigator, Robert Beseth, testified that in November 1984 he visited the defendant in the Du Page County jail. The defendant was asked to write a statement describing his activities in the jail and his work experience since graduating from high school. The statement, defendant's exhibit No. 19, was about 25 lines long. The defendant took 28 minutes to complete the statement.

The defendant's mother, Vern Larry, testified that her son had been in a special-education program since the second grade and that he was a "slow learner." On May 8, 1984, she drove the defendant's car home to Broadview. She did not have to put gasoline in the car to drive it. When she was looking for his wallet and paycheck in the armrest of the car, she found a hand-rolled cigarette under the armrest. She did not know what it was and screamed for her husband to come out to the car. He said it was marijuana; she became very upset, tore up the cigarette, and threw it in the garbage.

Defendant's girlfriend testified that she had been acquainted with the defendant for eight months prior to May 7, 1984. She said that she had observed on two occasions that when the defendant was under the influence of marijuana he became sleepy, wanted to eat, and became quiet.

Herbert Parker testified that he knew the defendant for about 12 years. Parker had never known the defendant to have been in trouble with the law.

Immediately prior to the testimony of Lazar Walker, the court addressed the jury, stating that Walker would not testify to any matter which might tend to incriminate him. Walker proceeded to testify that he lived a block away from the defendant and had known him for three years. He recognized the defendant's automobile. Upon further questioning, Lazar Walker invoked his fifth amendment rights.

Marvin Schwartz, a psychiatrist, was qualified as an expert in the

field of psychiatry of adolescents and young adults. In response to a lengthy hypothetical involving the facts of the case, and based on his experience in treating hundreds of young adults with psychiatric problems related to drug use, Schwartz' opinion was that at the time of the offense the defendant was under the influence of "super grass" or "super weed" which is marijuana laced with phencyclidine, also called "PCP" or "angel dust." Schwartz described PCP as "dangerous" because of its profound toxic effect on the central nervous system. He testified that the drug precipitates psychotic responses involving hallucinations, fantasies of great strength, inappropriate ideas, and a loss of judgment. He cited instances of people walking in front of trains and of a woman frying her own child. The preferred method for ingesting the drug involved smoking. Profound changes in mental state could occur within five minutes by merely ingesting two- to five-thousandths of a gram of the substance. Schwartz stated that there was a "significant question" whether, during the incident in the Dunkin' Donuts, the defendant could appreciate the criminality of his acts or conform his conduct to the requirements of the law.

▪▪▪ Defendant's first contention is that the court erred when it determined that his drugged condition was voluntarily induced and refused defense instructions based on involuntary intoxication. He argues the evidence presented warranted a conclusion that he did not voluntarily ingest phencyclidine because he had no knowledge that the white powder Lazar Walker put on the marijuana was phencyclidine, and his failure to inquire as to the nature of the powder may have been due to his reduced intellectual capacity.

The affirmative defense of involuntary intoxication is provided for by statute in section 6—3 of the Criminal Code of 1961:

"A person who is in an intoxicated or drugged condition is criminally responsible for conduct unless such condition either:

(a) Negatives the existence of a mental state which is an element of the offense; or

(b) Is involuntarily produced and deprives him of substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." Ill. Rev. Stat. 1983, ch. 38, par. 6—3.

If the State's evidence does not raise the issue of the alleged affirmative defense, in order to raise the issue the defendant must present "some evidence" thereon. (Ill. Rev. Stat. 1983, ch. 38, par. 3—2(a).) If the issue is raised, the State must then sustain the burden of proving the defendant guilty beyond a reasonable doubt as to that issue together with all the other elements of the offense. (Ill. Rev.

Stat. 1983, ch. 38, par. 3—2(b).) The quantum of proof necessary to raise an affirmative defense is evidence sufficient to raise a reasonable doubt as to defendant's guilt. (*People v. Redmond* (1974), 59 Ill. 2d 328, 337-38; *People v. White* (1979), 78 Ill. App. 3d 979, 981; *People ex rel. Illinois State Dental Society v. Norris* (1979), 79 Ill. App. 3d 890, 897.) A criminal defendant is entitled to have a jury instructed on any legally recognized affirmative defense theory on which he has presented "some evidence." (*People v. Roberts* (1985), 136 Ill. App. 3d 863; *People v. Ellison* (1984), 126 Ill. App. 3d 985, 997-98.) There must, however, be enough evidence to require that the issue be submitted to the jury. Stated otherwise, unless the evidence before the trial court is so clear and convincing as to permit the court to find as a matter of law that there is no affirmative defense, the factual issue—that is, whether the defendant should be relieved of criminal liability by reason of his affirmative defense—must be determined by the jury with proper instruction as to the law applicable. (*People v. Adcock* (1975), 29 Ill. App. 3d 917, 919; *Sherman v. United States* (1958), 356 U.S. 369, 2 L. Ed. 2d 848, 78 S. Ct. 819.) The issue, therefore, before the trial court below was whether the evidence before it concerning the defendant's intoxication was so clear and convincing that it could be said as a matter of law there was no affirmative defense of involuntary intoxication. *People v. Carpentier* (1974), 20 Ill. App. 3d 1024, 1027.

Viewing the evidence in the light most favorable to the defendant (*People v. Carpentier* (1974), 20 Ill. App. 3d 1024, 1027), the trial court here determined there were no facts which would allow a reasonable person to believe that the defendant had a defense of involuntary intoxication. The court's conclusion was based on its finding that the defendant "knowingly partook or participated in the smoking of a marijuana cigarette." Further, the court found that the defendant "was aware that his friend Lazar *** Walker placed, poured a white powder on top of the marijuana while it was in a cigarette wrapper and *** that there was no trickery, no deceit, no fraud which would allow the *** jury to consider the defense of involuntary *** intoxication." The court noted it had rejected the argument of the defendant that his "education and mental disabilities," when factored into the determination of whether he voluntarily took the phencyclidine, required that the jury should decide the issue of involuntary intoxication.

Defendant notes correctly that the "trickery, fraud and deceit" standard used by the court was set forth in *People v. Walker* (1975), 33 Ill. App. 3d 681, which, in turn, relied upon the case of *Bartholo-*

*mew v. People* (1882), 104 Ill. 601. In *Walker*, the defendant, who was convicted of attempted murder and murder, testified that a week before the incident, he got some pills from his brother to alleviate a stomach ache. Just prior to the incident, he took two more of those pills and drank some beer and wine. The defendant did not know and was not told by his brother that the pills contained Seconal, the effect of which is intensified by alcohol. The court concluded there was no fraud or force used to induce the defendant to take the pills and, consequently, his intoxication was voluntarily produced. The court noted the language of the involuntary-drunkenness statute which was the predecessor of the present one (Ill Rev. Stat. 1959, ch. 38, par. 599):

> " 'Drunkenness shall not be an excuse for any crime or misdemeanor, unless such drunkenness be occasioned by the fraud, contrivance or force of some other person, for the purpose of causing the perpetration of an offense; ***.' " *(People v. Walker* (1975), 33 Ill. App. 3d 681, 688.)

Given that language, and in light of the distinction in the present statute between voluntary and involuntary intoxication, the court determined that in order for the intoxication to be "involuntarily produced" it must be accompanied by some *outside influence* operating on the will of the defendant through trick, artifice or force. *(People v. Walker* (1975), 33 Ill. App. 3d 681, 688.) Thus, the phrase "involuntarily produced" in the context of this statute refers to the mechanical act of ingesting the intoxicant, rather than to a willing and intelligent assumption of the possible harmful consequences of ingesting the intoxicant. *Cf. State v. Hall* (Iowa 1974), 214 N.W.2d 205 (where dissent expressed view contrary to that of the majority that voluntariness should relate to a knowledgeable acceptance of the danger and risk involved rather than the mechanical act of ingesting the intoxicant).

We are not persuaded by defendant's argument that his ignorance of the nature of the white powder and his mental disability, either singularly or in combination, caused his intoxication to be involuntary. *People v. Brumfield* (1979), 72 Ill. App. 3d 107, on which defendant relies heavily for support, is factually similar in that the defendant's offer of proof there was that he had smoked marijuana which unknown to him contained "angel dust." The offer of proof was made in response to the State's motion *in limine* to bar evidence of intoxication at trial. The trial court granted the motion, and the defendant raised the issue on appeal. The State argued the defendant's offer of proof was insufficient as a matter of law to establish that defendant's intoxication was involuntary. The court reversed finding it was error to force the defendant to submit his affirmative defense to a pretrial

test. It is not clear from the facts given in *Brumfield* whether the defendant knew beforehand that the marijuana had been adulterated or if, as in the present case, he simply did not know what the adulterant was.

Unlike *Brumfield*, the defendant here had a full opportunity to develop his defense, and we agree with the State's position that ignorance can be a source of involuntariness only if it is a result of trickery, fraud or deceit. See, *e.g., People v. Penman* (1915), 271 Ill. 82, where the defendant was told that certain tablets were "breath perfumers" when in fact they contained a drug similar to cocaine.

The State cites *Hanks v. State* (Tex. Crim. App. 1976), 542 S.W.2d 413, a case in which the defendant's evidence was found not to have raised the defense of involuntary intoxication where he knew something had been dropped into his beer, but he did not know or ask what it was before he drank it. The court wrote:

> "If appellant was aware that a suspected drug had been placed in his drink, as he testified, and in spite of such knowledge he drank the beverage, any intoxication resulting therefrom could not be classified as *involuntary*. To constitute involuntary intoxication, there must be an absence of an exercise of independent judgment and volition on the part of the accused in taking the intoxicant." 542 S.W.2d 413, 416.

The defendant argues *Hanks* is distinguishable since the defendant testified a suspected drug had been placed in his drink. We agree with the State, however, that a reasonable person under the circumstances at bar would have or should have known that the white powder would somehow alter, most probably enhance, the effect of the illegal substance the defendant was going to smoke. The State distinguishes the other foreign-jurisdiction cases cited by the defendant on the basis they all involved ingestion of legal substances whereas marijuana is an illegal substance. (*Torres v. State* (Tex. Crim. App. 1979), 585 S.W.2d 746, 748 (Alka-Seltzer and Thorazine); *City of Minneapolis v. Altimus* (1976), 306 Minn. 462, 464-65, 238 N.W.2d 851, 854 (Valium); *Upshur v. State* (Del. 1980), 420 A.2d 165, 167 (prescribed drug and alcohol); *Jones v. State* (Okla. Crim. App. 1982), 648 P.2d 1251, 1254 (Ativan and alcohol).) The State urges that as a matter of public policy persons who knowingly smoke such illegal substances—even if they are ignorant of the addition of an intoxicating adulterant—should not be relieved of criminal responsibility. Notwithstanding its distinguishable procedural posture, the defendant points to *Brumfield* as a case in which the court did not summarily reject the defendant's proposed involuntary-intoxication defense although it

appears the defendant there voluntarily used the marijuana. He cites generally also *Grayson v. State* (Okla. Crim. App. 1984), 687 P.2d 747, as an example of a case in which the defense of involuntary intoxication was presented even though it involved the voluntary ingestion of an illegal drug, marijuana, laced with PCP. An instruction on the defense of involuntary intoxication was refused, however, on the ground the defendant's evidence was insufficient to raise a reasonable doubt as to the voluntariness of his intoxication in light of his statement to the police that he had taken PCP, and in light of the State's rebuttal evidence that the defendant nevertheless had voluntarily ingested a large amount of alcohol and drugs (two marijuana cigarettes).

We find it unnecessary either to accept or reject the policy advanced by the State in concluding that the trial court here did not err in refusing to instruct the jury on the defense of involuntary intoxication. The evidence shows the defendant knew the marijuana had been adulterated, that he "didn't bother" to ask what the adulterant was, and that he voluntarily smoked the marijuana. The evidence also shows that he voluntarily smoked three "reefers" of marijuana earlier that evening before he went to his girlfriend's house. The only evidence of defendant's so-called "diminished mental capacity" was his and his mother's testimony that he had been in a "special education" program from the second to the twelfth grade, and evidence that he was a very poor, slow writer. (*Cf. People v. Ellison* (1984), 126 Ill. App. 3d 985, 997 (where the defendant presented evidence in the form of his own testimony and expert opinion regarding his mental capacity in support of his theory that he lacked the requisite knowledge for the offense).) Defendant had used marijuana in the past, and he knew that it made him feel "dizzy, drowsy, and hungry." He testified he felt that same way during the incident, and that he thought everything seemed to be going "very fast" and that his head was "getting bigger, and his body smaller." However, we note he was able to testify in detail to his actions before, during, and after the incident.

We find little evidence in the record which would support his position that his failure to ask what the powder was should be excused because he "trusted" Lazar Walker. The evidence showed the defendant had known Lazar Walker for about three years, that he lived around the corner from defendant, that he had given the defendant marijuana recently twice before when they were at other friends' homes, and that he and Lazar "didn't communicate that much." Apparently, the "trust" defendant reposed in Lazar Walker was that Walker would again provide him with marijuana.

■ We note additionally our view that much of the evidence pre-

sented suggests the defendant appreciated the criminality of his act. He did not attack the victim until he got his knife out of the car; he directed the victim to "get in the back," out of view, and to take off her clothes; he prevented her escape and wounded her and rendered her unconscious when he was unable to have intercourse with her; and he disposed of the knife after exiting from the back door of the store.

Based on this record, we find no error in the court's judgment that the evidence the defendant's intoxication was not "involuntarily produced" was clear and convincing, and it properly refused defendant's tendered instructions.

■ Defendant's next contention is that the court erred in entering judgment on the charges of attempted rape (count IV) and aggravated battery causing great bodily harm (count V) since those charges were the predicate felonies for his two convictions for armed violence (counts II and III). The State concedes this issue based on *People v. Donaldson* (1982), 91 Ill. 2d 164. The State disagrees, however, with the defendant's further contention that the court also erred in entering judgment on count VI (aggravated battery based on use of a deadly weapon), arguing that each of the defendant's three acts of stabbing the victim can be the basis for separate convictions with concurrent sentences. (*People v. King* (1977), 66 Ill. 2d 551.) Defendant retorts that the three stab wounds should be viewed as having been the result of one act when the criteria set forth in *People v. Baity* (1984), 125 Ill. App. 3d 50, are applied. Since that one physical act was also the basis for count V, defendant contends it cannot also be the basis for a conviction as charged in count VI. But see *People v. Myers* (1981), 85 Ill. 2d 281.

We note that the record shows that at sentencing on March 14, 1985, the court vacated the judgments of conviction it had entered on the verdicts on counts IV, V and VI. The defendant filed his notice of appeal from his convictions on counts II and III on March 21, 1985. On April 4, 1985, the State moved that the court reinstate the judgments entered on counts IV, V and VI; the defendant objected on the basis the court had no jurisdiction to do so since he had filed his notice of appeal. The court granted the State's motion on April 11, 1985, and reinstated the judgments. No sentences were entered on any of those counts, and the court declared that the judgments could not be appealed.

Although neither party raises the issue on appeal, it is the obligation of the reviewing court to take notice of matters which go to the jurisdiction of the circuit court, and, accordingly, we address this issue *sua sponte. Buckley v. Chicago Board of Options Exchange, Inc.*

(1982), 109 Ill. App. 3d 462, 466; *Eastern v. Canty* (1979), 75 Ill. 2d 566, 570.

"It is a basic rule of law in Illinois that with few exceptions, *** the proper filing of a notice of appeal causes the jurisdiction of the reviewing court to attach instanter and concomitantly deprives the trial court of jurisdiction of the cause. (*Sherman v. Sherman* (1979), 74 Ill. App. 3d 451, 455; *Powers v. National Mirror Works* (1977), 52 Ill. App. 3d 592, 597; *People v. Kleba* (1971), 1 Ill. App. 3d 563, 565; see *People v. Long* (1977), 55 Ill. App. 3d 764, 778)." *People v. Baker* (1980), 85 Ill. App. 3d 661, 662.

Once the jurisdiction of the appellate court attaches, the cause is beyond the jurisdiction of the trial court. (*Daley v. Laurie* (1985), 106 Ill. 2d 33, 37.) The only actions the trial court may take in the matter subsequent to the notice of appeal being filed are purely ministerial. (*People v. McBride* (1983), 114 Ill. App. 3d 75, 79.) Only where a matter is independent of, and is collateral to, the judgment on appeal does the trial court retain jurisdiction to hear and decide the matter. *People v. Elsholtz* (1985), 136 Ill. App. 3d 209, 211; *People v. Verdone* (1985), 136 Ill. App. 3d 75, 76; *In re Marriage of Petramale* (1981), 102 Ill. App. 3d 1049, 1053.

■ The trial court's entry of orders reinstating its previous vacations of its judgments on count IV, V and VI was not "independent of, and collateral to" the judgments on appeal, but was integrally related thereto. When the court entered these reinstatement orders after the defendant's notice of appeal had been filed, it was without jurisdiction to do so. No sentences were imposed on the reinstated judgments, and, ordinarily, the propriety of such nonfinal judgments may not be considered on appeal. (But *cf. People v. Cartalino* (1982), 111 Ill. App. 3d 578 (absence of sentence on one of two or more defendant-appealed convictions is not jurisdictional defect in appellate court). Because the orders here were entered in an act of the circuit court which was beyond its jurisdiction at the time, they must be vacated. *People v. Baker* (1980), 85 Ill. App. 3d 661, 663.

Accordingly, for the reasons stated above, the cause is remanded to the trial court for vacation and expungement of the orders entered which were beyond its jurisdiction; the remainder of the court's judgments are affirmed.

Judgments affirmed; remanded with directions.

NASH, P.J., and LINDBERG, J., concur.