2025 IL App (1st) 221604-U

No. 1-22-1604

Order filed April 10, 2025

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 60185 |
| | ) | |
| MATTHEW LUCHINS, | ) | Honorable |
| | ) | James Michael Obbish, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE LYLE delivered the judgment of the court.
Presiding Justice Rochford concurred in the judgement.
Justice Ocasio dissented.

**ORDER**

¶ 1    *Held*: Defendant's conviction is affirmed over his contentions that the trial court abused its discretion by barring him from asserting an affirmative defense of involuntary intoxication and failed to award him proper sentencing credit.

¶ 2    Following a bench trial, the defendant, Matthew Luchins, was found guilty of second-degree murder (720 ILCS 5/9-2(a) (West 2018)) and sentenced to 14 years' imprisonment. On appeal, Matthew contends the trial court erred in denying him the chance to present a defense of

involuntary intoxication, where, although he knowingly consumed portions of a cannabis edible, he was unaware that it was laced with an adulterant that would cause him to enter a psychotic state. He also asserts the court erred in denying him sentencing credit for his participation in self-improvement programs while in pre-trial custody. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      Matthew was charged with six counts of first-degree murder (720 ILCS 5/9-1(a) (West 2018)) in the stabbing death of his father, Daniel Luchins. Matthew filed an answer to discovery and notified the State of his intent to present two affirmative defenses: (1) intoxicated or drugged condition, or involuntary intoxication, under 720 ILCS 5/6-3 (West 2018); and (2) use of force in defense of self or others under 720 ILCS 5/7-1 (West 2018).

¶ 5      Specifically, Matthew intended to argue that (1) his intoxication was involuntarily produced because he unknowingly ingested an edible that contained an adulterant, and (2) he lacked substantial capacity to appreciate the criminality of his conduct at the time of the incident. Alternatively, he intended to argue that due to his intoxication, he believed that his actions were in self-defense and in defense of his mother, Catherine Luchins. He tendered copies of two forensic psychiatric examination reports to support his claim of involuntary intoxication**.**

¶ 6                                  A. Motion in *limine*

¶ 7      Prior to trial, the State filed a motion *in limine* to prevent Matthew from arguing the affirmative defense of intoxicated or drugged condition. The argument on the motion was held January 13, 2022. The State argued that the defense was not available to Matthew because his intoxication was the result of his voluntary ingestion of an illegal substance. The State also asserted that voluntary intoxication was not a valid legal defense in Illinois.

¶ 8     In response, Matthew argued that the evidence would establish that his actions were the result of substance-induced psychotic behavior. He maintained that the cause of his behavior was "self-administered cannabis that was likely laced with ketamine or another adulterant." During his state of "involuntary intoxication," he believed that he had to kill his father to save himself and his mother. He argued that the involuntary act was "taking the substance as a whole not knowing what else [was] in there." Though he was not tested for ketamine or another adulterant at the time of the incident, Matthew was prepared to present testimony of two psychiatrists at trial who would testify that his self-reported state of mind and behavior were consistent with the effects of a substance such as ketamine.

¶ 9     Additionally, Matthew argued that the State could not show that he consumed an illegal substance because, at the time of the offense, possession of less than 10 grams of marijuana was a "civil matter." He asserted that 720 ILCS 5/6-3 did not specifically "address the legality or illegality of a substance," and that he should not be prevented from arguing involuntary intoxication because he "ingested an allegedly illegal substance."

¶ 10     On February 24, 2022, the trial court granted the State's motion. The court stated that voluntary intoxication was not a defense in the State of Illinois and observed that, according to the proffer, Matthew voluntarily ingested cannabis prior to the murder. It noted that cannabis is taken to "alter" a person's state of mind or to "get into an intoxicated state or some sort of euphoric state." It further noted that the "most relevant factor" in this case was that Matthew "ingested that substance voluntarily." It stated that when "intentionally consuming an intoxicating substance" a person is "assuming the risk of what that intoxicating substance is going to lead you to do," especially when a person consumes substances that are bought off the street.

¶ 11    The trial court then addressed the two expert opinions speculating that the cannabis cookie contained "ketamine or some other similar substance which caused [Matthew] to act in a way differently from when he normally ingests an intoxicating substance such as cannabis." The court reasoned that the defense was attempting to argue that, because Matthew reacted differently this time to taking cannabis, he should be able to claim that his drugged condition was involuntary produced. It commented that, despite the expert opinions, without medical evidence that Matthew had ketamine in his system, the admissibility of the expert testimony would depend on whether the court allowed the affirmative defenses to be presented at all. It stated, "[e]ven if there was some ketamine, I cannot divorce myself from the fact that [Matthew] voluntarily ingested a substance designed to produce an intoxicating effect."

¶ 12    The trial court ruled that the affirmative defense of involuntary intoxication was not available to Matthew. However, it did grant his request to present the affirmative defense of self-defense based on Matthew's unreasonable belief that he had to kill his father to save himself and his mother.

¶ 13                             B. Trial

¶ 14    At the bench trial, Catherine, Matthew's mother, testified that at the time of the incident, she, Matthew, and her husband lived together. On the day of the incident, Matthew returned home around midnight and that she could hear him and Daniel talking. Daniel then came into their bedroom and told her that Matthew was in a "highly impaired state" and had something to tell them.

¶ 15    Catherine went into the dining room with Daniel and Matthew. She stated that Matthew was walking in a strange way, "like Frankenstein," and was slapping himself. She and Daniel

attempted to get Matthew to sit down because he was agitated and jittery. She testified that his pupils were dilated, and he was hot to the touch. He continued to walk around for "quite awhile."

¶ 16    Matthew then led his parents back into their room. He tucked them in and left the room. Catherine and Daniel talked for a few minutes, then Catherine went back into the living room "to keep an eye on" Matthew. She watched him from the living room as he continued to walk around the dining room, randomly hitting himself on the head. She went into the kitchen to get him a glass of water and he followed her.

¶ 17    Matthew then walked aimlessly around the kitchen. Catherine saw him look at a block of knives on the counter, which made her uncomfortable. She tried to get him to leave the kitchen, but he did not. He walked past the knife block several times then walked up to it, pulled one of the knives a few inches out of the block, then pushed it back in "rather rapidly," saying "no." Suddenly, he grabbed one of the knives with "tremendous force," and ran past her toward the bedroom.

¶ 18    Catherine followed Matthew into the bedroom and saw him stabbing Daniel. She attempted to stop him, but he pushed her away and continued to stab Daniel. She watched Daniel get up and go towards the kitchen. She followed into the kitchen where she saw Daniel lying on his back while Matthew repeatedly stabbed him. Believing Daniel was dead, Catherine ran into the hallway, screaming.

¶ 19    The Luchins' neighbors across the hall, Elizabeth Steiner and Ian Jackson, came out into the hallway. After speaking to Catherine, Ms. Steiner called 911 and went down to wait for the police and the paramedics. Mr. Jackson went to the Luchins' condo with Catherine. Mr. Jackson saw Daniel lying on the floor with Matthew standing over him, stabbing him. Mr. Jackson and Catherine yelled at Matthew to stop. Matthew then stood up, moved to the other side of Daniel, crouched down, and stabbed him in the abdomen. They watched him run the knife across Daniel's

throat. Mr. Jackson went back into the hallway and heard Matthew say, "it's done," in a "matter of fact" way.

¶ 20    Sergeant Philip Hooper testified that at approximately 3 a.m. on May 2, 2018, he was the first officer on the scene in response to a call for a person with a knife. When he met Catherine in the hallway, she was upset and covered in blood. She told him that her son went "crazy" and stabbed her husband. Sergeant Hooper went to the door of the Luchins' condo and asked Matthew to come out into the hallway. Matthew walked into the hallway, placing his hands behind his back. Officers handcuffed and transported him to the hospital. Toxicology reports from the hospital were positive for cannabis, but negative for alcohol or other controlled substances.

¶ 21    Matthew testified that at approximately 8 p.m. on the night of the incident, he met with his friend, Issac Miller, at Soldier Field to attend a light show and Chinese cultural event. Earlier in the day, Mr. Miller told him not to drive to the event because he was "bringing one of his brownies," which Matthew believed meant brownies with cannabis in them. They previously discussed Mr. Miller's cannabis brownies, but Matthew never had one before the day of the incident. When they arrived, Mr. Miller offered him part of an edible that looked homemade. He took a "minuscule" piece, about the size of the top third of an index finger and ate it.

¶ 22    After some time passed, Matthew was only feeling the "teeniest effect" of what he was used to experiencing from cannabis. He took a second portion which was the size of a nickel and ate it. About 35 to 40 minutes later, he began to feel the effects from the edible. He stated that they were the common effects he previously experienced from cannabis. He testified that he previously eaten cannabis edibles and smoked cannabis over 150 times. During those instances, he experienced introspection, creative thoughts, and had unique perceptions. Later that night, he had

a "bizarre unexplainable feeling of needing to kind of keep everyone together" and felt a compulsion to use his hands to keep everyone together.

¶ 23    Matthew took an Uber home and rode in the backseat of the vehicle, which was unusual for him. He stated that he knew he was not capable of having a conversation with the driver as he typically would. He blacked out during most of the ride and only remembered when the car picked him up and a few minutes before it dropped him off at home. When he walked into the lobby of his building at around 11 p.m., he tried to greet the security guard like he usually would, but "couldn't get words out." He began feeling "overwhelmed by this sense of having forgotten the most important thing in my life" and that the feeling would not go away. He testified that there was a physical aspect of this feeling, and he began pacing by the elevator in the lobby.

¶ 24    After pacing the lobby for 15 minutes, he went to the floor where the Luchins' condo was located. He continued to "pace and move and gesture" in the hallway, trying to "figure out this thing that was just overwhelming." After about 45 minutes, he went into the condo, straight to his parents' bedroom. He continued desperately searching for what it was that he had forgotten, because he still had the feeling. He tried to explain the feeling to his father, but he was unable to.

¶ 25    Matthew attempted to go to sleep in his room, but was "extremely uncomfortable" and could not lay still. He got up and went back into the kitchen. He then saw a "ray of light shining on the big knife in the butcher block." He had an "instantaneous realization" that he needed to take the knife and stab his father. He tried to stay away from the knife block, hoping the feeling would go away. He began to pace in front of the knife block then pulled one of the knives out. He looked toward Catherine for confirmation that it was what he was supposed to do. When she asked him what he was doing, he put the knife back and continued to pace. He felt a "blackness" come over

him and that his field of vision started "shrinking." He looked again at Catherine and thought she looked "skeletal." He had another realization that if he did not stab Daniel, the "force" would be coming for him and Catherine. He believed that if he did not kill Daniel, he and Catherine would die.

¶ 26     Matthew grabbed the knife and ran into his parents' bedroom. He met Daniel in the doorway and began to stab him. He looked at Daniel's face but saw a "monstrous thing." He continued to stab him, "trying to end it." He explained that he felt energy leave Daniel and that something inside Matthew made him say "I love you." Matthew then got up and had a realization that he needed to have sex with his mother. When he found her, Mr. Jackson attempted to keep her away from him. He heard Catherine scream, then "realized that everything [Matthew] thought was real" was not. When the police arrived, he went into the hall and placed his hands behind his back because he knew at that time what he had done was wrong.

¶ 27     Dr. Stafford Henry, an expert in the field of forensic psychiatry, testified on behalf of Matthew. Dr. Henry stated that he interviewed Matthew in Cook County Jail in January and May of 2019. Before interviewing Matthew, he reviewed the following: (1) reports of Matthew's prior psychological treatment; (2) police reports related to the stabbing; (3) the postmortem examination report; (4) grand jury transcripts from Ms. Steinert and Mr. Jackson; (5) Sergeant Hooper's body worn camera footage of the crime scene and the arrest; and (6) reports authored by Dr. Curran of Clinical Forensic Services and Dr. Dinwiddie, a psychiatrist at Northwestern Hospital.

¶ 28     During his evaluation, Matthew told Dr. Henry that he voluntarily consumed a "THC containing cookie," after being told it was "really strong," on the night of the incident. Dr. Henry

acknowledged that Matthew never asked who made the cookie or what was in the cookie. Matthew described the cookie to Dr. Henry as "homemade" and told him that he was aware it was "strong."

¶ 29    Dr. Henry opined, to a reasonable degree of medical and psychiatric certainty, that Matthew was in "a psychotic delusional state" at the time of the murder. He defined "psychotic" as a "compilation of symptoms" including "delusions, hallucinations, paranoia" that are a "function of either a mood-altering substance or a function of psychiatric illness." He believed that Matthew's psychotic behavior was a characteristic of an adulterant. On cross-examination, Dr. Henry stated that hallucinations, delusions, and paranoia could be caused by tetrahydrocannabinol, or THC.

¶ 30    The trial court found Matthew guilty of second-degree murder. The court noted that there was enough evidence to find Matthew guilty of first-degree murder. However, the court found that Matthew presented credible testimony and evidence that showed his belief that he was acting in self-defense. It stated that "all [Matthew's] actions indicate someone who is not acting with their normal faculties."

¶ 31                                    C. Sentencing

¶ 32    The trial court sentenced Matthew to 14 years' imprisonment. It declared that Matthew would be "given credit for every day that he has served in custody or any other credits he has earned by virtue of the fact of being incarcerated and engaging in any other kind of programs."

¶ 33    Matthew filed a motion arguing that he should receive credit for various programs he attended while incarcerated, including: (1) housing on "the program tier"; (2) classes through Northwestern University; (3) a weekly yoga and meditation program; (4) weekly chess games; (5) GED tutoring and volunteer literacy program; (6) poetry and writing workshops; (7) Colby House

Positive psychology, and (8) working at the jail. He requested a total of 1332 days in "program credit" for his participation in programs that were geared toward "behavior modification" and had a positive impact on him and others.

¶ 34    The State agreed that under 730 ILCS 5/3-6-3(a)(4) (West 2024), Matthew was entitled to one day credit for each day engaged in full time substance abuse programs and correctional facility assignments. The State also conceded that Matthew was entitled to 84 days' credit for working while incarcerated, but that the other credits he requested did not qualify as substance abuse or work release programs. Rather, it cited subsection 4.1(A), arguing that the credits qualify for a half day credit.

¶ 35    The trial court ruled that Matthew would be given the credits he was seeking, apart from the requested credits for yoga, meditation and chess. The court granted him 1623 days credit for time actually served and 438 days of program credit, for a total of 2061 days. Matthew now appeals the trial court's rulings.

¶ 36                                    II. ANALYSIS

¶ 37    We note that we have jurisdiction to consider this matter, as Matthew filed a timely notice of appeal. See Ill. S. Ct. R. 606 (eff. July 1, 2017); see also *People v. English*, 2023 IL 128077, ¶ 25.

¶ 38    Matthew argues that the trial court abused its discretion by granting the State's motion *in limine* barring him from asserting an affirmative defense of involuntary intoxication to the first-degree murder count. He also contends that the court did not award him proper sentencing credit. We begin our analysis with the trial court's decision regarding the State's motion *in limine*.

¶ 39    In reviewing a trial court's ruling on a motion *in limine*, our standard is abuse of discretion. *People v. Robinson*, 368 Ill. App. 3d 963, 974 (2006). An abuse of discretion occurs when a ruling is arbitrary, fanciful, or unreasonable or "where no reasonable man would take the view adopted by the trial court." *People v. Santos*, 211 Ill. 2d 395, 401 (2004).

¶ 40    Here, Matthew sought to present an affirmative defense of involuntary intoxication. When a trial court is faced with a motion *in limine*, the court must proceed with caution as to not deprive a defendant of a legally viable defense. *People v. Henderson*, 223 Ill. App. 3d 131, 135 (1991). However, the trial court is not required to admit evidence supporting that defense unless it is legally viable. *Id.* To raise an affirmative defense, the defense must disclose it to the prosecution within a reasonable time by filing a written motion before a hearing or trial. Ill. S. Ct. R. 413(d) (eff. July 1, 1982). The defendant must also present some evidence to support the alleged defense. 720 ILCS 5/3-2(a) (West 2002). Because a purported defense can exculpate a defendant, even very slight evidence would require an instruction to the jury. *Hari*, 218 Ill. 2d at 296.

¶ 41    Prior to trial, the court granted the State's motion *in limine*, barring Matthew from asserting involuntary intoxication as a defense to his first-degree murder charge. Matthew argues that the trial court abused its discretion because he presented some evidence to support such a defense. Though he admitted to voluntarily consuming an edible he believed contained cannabis, he maintains that he should have been able to argue that his drugged state was involuntarily produced by the unknown presence of an adulterant.

¶ 42    Prior to 1988, section 6-3 of the Criminal Code of 1961 (Criminal Code) provided that an intoxicated or drugged person was "criminally responsible for conduct unless such condition either: (a) negatives the existence of a mental state which is an element of the offense; or (b) is involuntarily produced and deprives him of substantial capacity either to appreciate the criminality

of his conduct or to the requirements of law." Ill. Rev. Stat. 1985, ch. 38, ¶ 6-3. In 1988, section

6-3 was amended, providing that an intoxicated or drugged person was

> "criminally responsible for conduct unless such condition either:
>
> (a) Is so extreme as to suspend the power of reason and render him incapable of forming a specific intent which is an element of the offense; or
>
> (b) Is involuntarily produced and deprives him of substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law." 720 ILCS 5/6-3 (West 2000).

¶ 43    This court ruled on a series of cases regarding the issue of "involuntariness," holding that

for the intoxication to be "involuntarily produced" it must be accompanied by some outside

influence operating on the will of the defendant through trick, artifice, or force. *People v. Larry*,

144 Ill. App. 3d 669, 677 (1986). The *Larry* court further held that the defendant who smoked

marijuana after witnessing another person put white powder on it was voluntarily intoxicated. *Id.*

at 679.  This court in *People v. Walker*, 33 Ill. App. 3d 681, 687-88 (1975), held that the defendant

who received pills containing Seconal, a tranquilizing drug from his brother who consumed

alcohol while taking the pills acted voluntarily. In *People v. Downey*, 162 Ill. App. 3d 322, 335

(1987), this court held that the defendant's admitted cocaine addiction did not render his actions

involuntary. This court in *People v. Gerrior*, 155 Ill. App. 3d 949, 953 (1987), held that the

defendant, who knew about the nature of prescribed medication he was taking and was told of the

potential extreme reaction when taken with alcohol, was voluntarily intoxicated.

¶ 44    Section 6-3 was again amended, effective January 15, 2002, to provide that an intoxicated

or drugged person "is criminally responsible for conduct unless such condition is involuntarily

produced and deprives him of substantial capacity either to appreciate the criminality of his

conduct or to conform his conduct to the requirements of the law. 720 ILCS 5/6-3 (West 2018);

*People v. Rutigliano*, 2020 IL App (1st) 171729, ⁋ 69. In *People v. Rutigliano*, this court held that the trial court correctly instructed the jury that voluntary intoxication was not a defense to a criminal charge. *Id.* at ⁋ 72; see also *People v.* Grayer, 2022 IL App (1st) 210808, ¶ 41 ("section 6-3 provides that voluntary intoxication is not an excuse for criminal conduct").

¶ 45    Matthew agrees that voluntary intoxication is not a legally viable defense. However, he argues that his drugged condition was involuntarily produced because he was unaware of the presence of an adulterant in the cannabis cookie. Further, he notes that section 6-3 does not make a distinction between legal and illegal drugs as to the cause of intoxication.

¶ 46    In *People v. Hari*, our supreme court revisited the issue of the involuntary intoxication defense. 218 Ill. 2d at 292. The defendant in *Hari* argued that his drugged condition was due to an unexpected adverse side effect of a prescription drug that was unwarned by the prescribing doctor. *Id.* at 291. At trial, evidence was presented that the defendant ingested his prescribed antidepression medication, and a diphenhydramine, or Tylenol, which according to defendant's expert witness, is officially used for allergies. *Id.* at 283. The expert witness opined that the defendant's involuntary intoxication "deprived him of the substantial capacity to appreciate the criminality of his acts or conform his conduct to the requirements of the law at the time of the shooting." *Id.* at 285.

¶ 47    The court rejected its previous definition as being overly restrictive as it confined the definition of "involuntarily produced" to trick, artifice or force. *Id.* at 293. Instead, the court applied definitions given by Webster's Third New International and Black's Law Dictionaries. *Id.* at 292-93. Webster's Third New International Dictionary defines "involuntary" as "springing from accident or impulse rather than conscious exercise of the will." Webster's Third International Dictionary 1191 (1993). Black's Law Dictionary defines "involuntary" as "[n]ot resulting from a

free and unrestrained choice; not subject to control by the will." Black's Law Dictionary 833 (7th ed. 1999).

¶ 48    In holding that the evidence presented warranted a jury instruction on a defense of involuntary intoxication in *Hari* the Court stated:

> "The overly restrictive interpretation underlying those courts' denial of an involuntary intoxication instruction may be due to their distinguishable facts. The cases did not determine whether the phrase 'involuntarily produced' encompassed, as here, a defendant's adverse drugged condition resulting from the ingestion of drugs according to doctor's orders. [Citations.] Each of those situations lacked the kind of 'external influence' on the cause of a defendant's drugged condition that defendant's evidence propounded here. In each of those cases, the defendant's drugged condition was a result of the defendant's conscious choice." *Hari*, 218 Ill. 2d at 293-94.

The *Hari* court specifically distinguished that case from its progeny. *Hari*, 218 Ill. 2d at 294 ("To the extent that *Rogers*, *Downey*, *Gerrior*, *Walker*, and *Larry* can be read as excluding the unexpected and unwarned adverse side effects from medication taken on doctor's orders from the plain meaning of 'involuntarily produced,' they are overruled").

¶ 49    Acknowledging the expansion and exception created by *Hari*, this court in *People v. McMillen*, 2011 IL App (1st) 100366, ¶ 23, distinguished *Hari* stating:

> "Defendant's ingestion of prescription medication does not render his case distinguishable from the cases cited above because in all of those cases, the use of illegal drugs or consumption of alcohol was involved, as it was here. Defendant's case, however, is distinguishable from *Hari* because the defendant there did not voluntarily ingest any illegal substance."

In this case, Matthew asserts that section 6-3 does not differentiate between legal and illegal drugs as to the cause of intoxication. However, he concedes that there is no Illinois case law that allows the affirmative defense of involuntary intoxication where a defendant has voluntarily ingested an illegal substance. He also admits to voluntarily ingesting a homemade cannabis cookie, an illegal

substance. Despite these concessions, Matthew maintains that possession and usage of cannabis was not illegal on the date of this incident but was decriminalized.

¶ 50    On the date of this crime, cannabis possession and usage, although decriminalized, remained illegal. According to the Merriam-Webster dictionary, the definition of "decriminalization" is to "remove or reduce the criminal classifications or status of," or "to repeal a strict ban on, while keeping some form of regulation." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/decriminalize (last visited Jan. 15, 2025). Thus, the state of the law was the possession and use of cannabis remained illegal, while maintaining restrictions or regulations permitting its use. Decriminalization did not legalize cannabis use and possession.

¶ 51    The statute governing intoxicated defenses has been amended several times. As society's attitudes towards cannabis changed, so too did the attitudes and laws regulating the possession and use of cannabis. The future may undoubtedly see further transformation in public attitudes and corresponding legal restrictions removing all regulations as to possession and usage. However, on the date of this crime, possession and usage, although decriminalized, remained illegal. That being the case, it is clear that Illinois case law differentiates between the involuntary intoxication defense where a person has unexpected psychotic incidences as a result of prescription medication, as per *Hari*, versus the use of the involuntary intoxication defense where an illegal substance is ingested. We, therefore, find that the court did not abuse its discretion in granting the State's motion in *limine* barring Matthew from asserting the defense of involuntary intoxication.

¶ 52    We further note that the trial court, having heard the testimony of the expert witnesses and reading their reports, properly received the evidence of Matthew's intoxication as mitigation on the second-degree murder charge. See *Rutigliano*, 2020 IL App (1st) 171729, ¶ 73 (intoxication

can be a basis for mitigation, affecting the defendant's unreasonable belief in self-defense). Thus, we affirm the trial court's decision to bar Matthew from asserting the affirmative defense of involuntary intoxication.

¶ 53                              B. Sentencing Credit

¶ 54    Matthew next claims that the trial court improperly denied him presentence custody credit for time spent practicing yoga and meditation and playing chess while awaiting trial. He contends that the programs he did not receive adequate credit for qualified as "self-improvement programs," thus eligible for a half day's credit. According to Matthew, the court erred refusing to grant 260 days of credit. This court reviews the calculation of the number of days a defendant served in presentence custody *de novo* because the resolution of that issue does not require deference to the trial court's reasoning. *People v. Dailey*, 2016 IL App (4th) 150588, ¶ 19.

¶ 55    Section 3-6-3(a) of the Unified Code of Corrections (Unified Code) provides that "The Department of Corrections shall prescribe rules and regulations for awarding and revoking sentence credit for persons committed to the Department which shall be subject to review by the Prisoner Review Board." 730 ILCS 5/3-6-3(a)(1) (West 2020). Section 5-4-5-100(c-5) states that, "[t]he trial court shall give the defendant credit for successfully completing county programming while in custody to imposition of sentence at the rate specified in Section 3-6-3 (730 ILCS 5/3-6-3)." 730 ILCS 5/5-4.5-100(c-5) (West 2020).

¶ 56    The Unified Code also provides that:

> "The rules and regulations shall also provide that any prisoner engaged in self-improvement programs, volunteer work, or work assignments that are not otherwise eligible activities under paragraph (4), shall receive up to 0.5 days of sentence credit for each day in which the prisoner is engaged in activities described in this paragraph." 730 ILCS 5/3-6-3(a)(4.2).

Activities such as educational programs, correctional industry assignments, work-release programs, full-time substance abuse programs, behavioral modification programs, life skills courses, or re-entry programs are listed under paragraph (4). 730 ILCS 5/3-6-3(a)(4).

¶ 57    Matthew insists that his participation in chess, yoga, and meditation activities should be considered self-improvement programs. While we acknowledge that the statute does not define "self-improvement programs," we do not believe it was the legislature's intention to award sentencing credit for personal activities. See *People v. Alexander*, 204 Ill. 2d 472, 485 (2003) (when interpreting a statute, the primary rule is to ascertain and effectuate the legislature's intent).

¶ 58    In addition to self-improvement programs, the statute lists "volunteer work, or work assignments" not named in paragraph (4) of the statute as eligible for sentencing credit. 730 ILCS 5/3-6-3(a)(4.2). When juxtaposed with volunteer work and work assignments, activities such as playing chess, meditation, and yoga cannot reasonably be included in the same class as "self-improvement" activities eligible for credit. See *Dynak v. Board of Education of Wood Dale School District 7*, 2020 IL 125062 ¶ 22 ("It is a general rule that words grouped in a list should be given related meaning, pursuant to the doctrine of *noscitur a sociis*").

¶ 59    Moreover, programs listed in paragraph (4) include "educational programs, correctional industry assignments, work-release programs, full-time substance abuse programs, behavioral modification programs, life skills courses, or re-entry programs." See 730 ILCS 5/3-6-3(a)(4). The listed programs are designed to give incarcerated individuals the tools to reintegrate into society and be productive citizens. We do not believe the legislature intended for participation in chess, yoga, and meditation, to be in the same category as the programs listed in the statute. We, therefore, affirm the judgment of the trial court.

¶ 60                                    CONCLUSION

¶ 61    Accordingly, we affirm the judgment of the circuit court of Cook County.

¶ 62    Affirmed.

¶ 63    JUSTICE OCASIO, dissenting:

¶ 64    According to two different psychiatrists, when Matthew Luchins stabbed his father to death, he was in the midst of a psychotic episode caused not by the cannabis he had ingested several hours earlier but by a second, unidentified substance—perhaps ketamine or bath salts—that, unbeknownst to Matthew, had been mixed in with the cannabis. The question before us is whether the fact that Matthew was unaware that the edible he consumed contained that second substance meant that his subsequent state of psychosis was "involuntarily produced" so as to support a defense of involuntary intoxication. See 720 ILCS 5/6-3 (West 2018).

¶ 65    The majority holds that, even though Matthew did not know that he was consuming whatever substance it was that produced his psychosis, his knowing consumption of cannabis precludes an involuntary-intoxication defense because cannabis was, at the time, technically illegal in Illinois. It reaches that conclusion based on its analysis of a line of cases that, unlike this case, involved defendants who *knowingly* consumed the substances that caused their intoxication. In *People v. Walker*, 33 Ill. App. 3d 681 (1975), the defendant knew he was consuming both alcohol and whatever drug was in the pills his brother had given him for stomach pain. *Id.* at 687. In *People v. Larry*, 144 Ill. App. 3d 669 (1986), the defendant knew that the joint he was smoking contained both cannabis and some kind of white powder that turned out to be phencyclidine, commonly known as angel dust or PCP. *Id.* at 677. In *People v. Gerrior*, 155 Ill. App. 3d 949 (1987), the defendant knew he was consuming both alcohol and a prescription medication that his physician

had specifically warned him could provoke an "extreme reaction" if mixed with alcohol. *Id.* at 953. And in *People v. McMillen*, 2011 IL App (1st) 100366, the defendant knew he was consuming cocaine and four other prescription drugs. *Id.* ¶ 28.

¶ 66    In stark contrast to these cases, Matthew knew he was consuming cannabis, but he did not know that he was also ingesting a second substance that, according to his expert witnesses, led to his psychotic episode. And the majority inexplicably overlooks the only published case the parties have brought to our attention involving that scenario. In *People v. Brumfield*, 72 Ill. App. 3d 107 (1979), the court held that it was reversible error for the trial court to bar, on the State's pretrial motion *in limine*, evidence that the defendant had smoked cannabis that, unknown to him, had been laced with "angel dust." *Id.* at 110-113. As far as I can tell, there are no legally significant differences between *Brumfield* and this case. Here, as in *Brumfield*, Matthew's defense was based on the theory that, while knowingly consuming cannabis, he unknowingly ingested a different substance that produced the condition that, he alleges, made him substantially unable to appreciate the nature of his conduct or conform his actions to the law. Here, as in *Brumfield*, the trial court barred that defense based on a pretrial motion *in limine*, depriving Luchins of the opportunity to even present evidence at trial to support it. *Id.* at 112-13. Here, as in *Brumfield*, the trial court effectively granted summary judgment in favor of the State on an issue that, had Luchins sufficiently raised at trial, the State would have had to the burden of disproving beyond a reasonable doubt. See *People v. Tuduj*, 2014 IL App (1st) 092536, ¶ 75. Here, as in *Brumfield*, Matthew is entitled to a new trial so he can present that defense. *Brumfield*, 72 Ill. App. 3d at 113.

¶ 67    Even if *Brumfield* did not exist, moreover, the distinction the majority draws between legal and illegal substances is supported by neither the involuntary-intoxication statute nor *McMillen*. The statutory point is simple. Section 6-3 of the Criminal Code of 2012 provides: "A person who

is in an intoxicated or drugged condition is criminally responsible for conduct unless such condition is involuntarily produced and deprives him of substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." 720 ILCS 5/6-3 (West 2018). "The cardinal rule of statutory construction is to give effect to the intent of the legislature." *People v. Hari*, 218 Ill. 2d 275, 292 (2006). That intent is best discerned from the plain and ordinary meaning of the language used in the statute. *Id.* "It is never proper for a court to depart from plain language by reading into the statute exceptions, limitations or conditions which conflict with the clearly expressed legislative intent." *Id.* By the plain language of the statute, the availability of the defense turns on whether the "condition is involuntarily produced." The legal status of the substance does not make a difference. The majority's carve-out for defendants who unknowingly ingest a dangerous adulterant when consuming a different unlawful substance is entirely unsupported by the text of the statute.

¶ 68    The majority's misunderstanding of *McMillen* is somewhat more complicated. In a line of cases stemming from *Walker*, this court held that the defense of involuntary intoxication was only available when the defendant's intoxicated condition had been procured through an outside influence such as force, fraud, or deceit. See, *e.g.*, *Gerrior*, 155 Ill. App. 3d at 952-53 ("The appropriate inquiry *** is whether the intoxication was 'involuntarily produced' by an outside influence operating on the will of the intoxicated defendant which forced, tricked, or fraudulently induced intoxication."). *People v. Hari*, 218 Ill. 2d 275 (2006), however, rejected that rule as too narrow in. *Id.* at 293-94. In *Hari*, our supreme court explained that an involuntarily produced condition is one that "is not a conscious effect of a defendant's will, is not resulting from a defendant's free and unrestrained choice, and is not subject to [the] control of [a] defendant's will." *Id.* at 293. Applying that broader interpretation—which, the court noted, would not have changed

the result in the *Walker* line of cases (*id.* at 293-94)—the court held that "an unexpected adverse side effect of a prescription drug that was unwarned \*\*\* is 'involuntarily produced.' " *Id.* at 292. Thus, the defendant in *Hari*, who had committed the charged murder while allegedly under the influence of an adverse interaction between a prescription medication and an over-the-counter medicine, could assert that the effect of that interaction was involuntary. *Id.* at 283, 295-96.

¶ 69    That brings us to *McMillen*. There, the defendant's intoxicated condition had been caused by him "taking four prescription medications and ingesting an 'eight ball' of cocaine." *Id.* ¶ 28. The defendant argued that, under *Hari*, his intoxication was involuntary because nobody had warned him that using cocaine and prescription drugs could have adverse side effects. *Id.* ¶ 16. The court rejected that argument, finding that the potential adverse side effects of using cocaine by itself were so well-known that the risks associated with mixing it with multiple prescription drugs were "so obvious that a warning need not be made by a physician." *Id.* ¶ 28. In explaining its decision, however, the *McMillen* court spoke in broader terms; for instance, it asserted that "Illinois case law supports a conclusion that the knowing, or voluntary, ingestion of cocaine or other illegal drugs precludes the use of the involuntary intoxication defense." *Id.* ¶ 23. "It is fundamental, however, that the precedential scope of a decision is limited to the facts before the court." *People v. Palmer*, 104 Ill. 2d 340, 345-36 (1984). And the facts before the court in *McMillen*—and in the cases it followed—did not involve any substances that had been consumed unknowingly. When its broad statements are read in that context, *McMillen* simply stated the obvious: to knowingly use an intoxicating substance is to voluntarily bring about the intoxicated condition that substance produces. That is true even for legal intoxicants like alcohol. See *id.* ¶ 23 (distinguishing *Hari* from cases where "the use of illegal drugs or consumption of alcohol was involved").

¶ 70     Here, however, Matthew's defense is not based on his knowing use of cannabis but his unknowing consumption of the second substance that, according to his experts, was also cooked into the edible he ate. Under *McMillen*—and *Hari* and the *Walker* line of cases—there is no doubt that Matthew voluntarily brought about the condition of cannabis intoxication when he knowingly ingested a cannabis edible. But he cannot be deemed to have voluntarily submitted to the effects of a substance that he did not know was there. Because the majority's contrary holding departs from both precedent and the plain meaning of the involuntary-intoxication statute, I must respectfully dissent.